583 A.2d 277

HOLMDEL BUILDERS ASSOCIATION, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. TOWNSHIP OF HOLMDEL IN THE COUNTY OF MONMOUTH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF HOLMDEL AND THE PLANNING BOARD OF THE TOWNSHIP OF HOLMDEL, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS, AND TOWNSHIP OF CHERRY HILL, INTERVENOR–APPELLANT.

NEW JERSEY CHAPTER OF THE NATIONAL ASSOCIATION OF INDUSTRIAL AND OFFICE PARKS, PLAINTIFF–RESPONDENT, v. TOWNSHIP OF SOUTH BRUNSWICK IN THE COUNTY OF MIDDLESEX, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK, THE PLANNING BOARD OF THE TOWNSHIP OF SOUTH BRUNSWICK AND THE ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF SOUTH BRUNSWICK, DEFENDANTS–APPELLANTS, AND TOWNSHIP OF CHERRY HILL, INTERVENOR–APPELLANT.

NEW JERSEY BUILDERS ASSOCIATION, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. THE TOWNSHIP OF CHESTER IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND THE MAYOR AND TOWNSHIP COUNCIL OF THE TOWNSHIP OF CHESTER, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS, AND TOWNSHIP OF CHERRY HILL, INTERVENOR–APPELLANT.

CALTON HOMES, INC., PLAINTIFF–RESPONDENT, v. TOWNSHIP OF MIDDLETOWN IN THE COUNTY OF MONMOUTH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MIDDLETOWN, DEFENDANTS–APPELLANTS, AND TOWNSHIP OF CHERRY HILL, INTERVENOR–APPELLANT.

Argued February 13, 1990—Decided December 13, 1990.

552

*Alfred L. Ferguson* argued the cause for appellants and cross-respondents Township of Chester, etc., et al. (*McCarter & English*, attorneys, *Alfred L. Ferguson* and *Gary T. Hall*, on the briefs).

*William F. Dowd* argued the cause for appellants Township of Middletown, etc., et al. (*Dowd & Reilly*, attorneys).

*Joseph J. Benedict* argued the cause for appellants Township of South Brunswick, etc., et al. (*Benedict and Altman*, and *Howard W. Weber*, attorneys, *Joseph J. Benedict* and *Howard W. Weber*, on the brief).

*Ronald L. Reisner* argued the cause for appellants and cross-respondents Township of Holmdel, etc., et al. (*Gagliano, Tucci, Iadanza and Reisner*, attorneys, *S. Thomas Gagliano* and *Eugene A. Iadanza*, of counsel).

*Francine I. Axelrad,* Municipal Attorney, argued the cause for intervenor-appellant Township of Cherry Hill.

*Henry A. Hill* and *Thomas F. Carroll, III,* argued the cause for respondents and cross-appellants (*Wallack & Masanoff,* attorneys, *Mitchell Newman,* on the briefs).

*Stephen Eisdorfer,* Assistant Deputy Public Advocate, argued the cause on behalf of *amicus curiae* Public Advocate of New Jersey (*Thomas S. Smith, Jr.,* Acting Public Advocate, attorney).

*William H. McCarty, Jr.,* submitted a brief on behalf of *amicus curiae* Township of Princeton (*Mason, Griffin & Pierson,* attorneys, *Edwin W. Schmierer,* of counsel).

*Kenneth E. Meiser* submitted a brief on behalf of *amici curiae* Civic League of Greater New Brunswick and the League of Women Voters (*Frizell, Pozycki & Meiser,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In 1975, this Court held that developing municipalities are constitutionally required to provide a realistic opportunity for the development of low- and moderate-income housing. *Southern Burlington County NAACP v. Mount Laurel Township,* 67 *N.J.* 151, 336 *A.2d* 713, *cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.2d* 28 (1975) (*Mt. Laurel I*). In the years following, many municipalities failed to comply with the clear mandate of *Mt. Laurel I.* The failure to provide the necessary opportunity for affordable housing led to a new legal challenge. We clarified and reaffirmed the constitutional mandate set forth in *Mt. Laurel I,* imposing an affirmative obligation on every municipality to provide its fair share of affordable housing. *Southern Burlington County NAACP v. Mount Laurel Township,* 92 *N.J.* 158, 456 *A.2d* 390 (1983) (*Mt. Laurel II*). We enumerated several possible approaches by which municipalities could comply with the constitutional obligation, includ-

ing lower-income density bonuses and mandatory set-asides. We stressed that "municipalities and trial courts are encouraged to create other devices and methods for meeting fair share obligations." *Id.* at 265–66, 456 *A.*2d 390. Subsequently, the Legislature codified the *Mt. Laurel* doctrine, including its available compliance measures, by enacting the Fair Housing Act, *L.*1985, *c.* 222; *N.J.S.A.* 52:27D–301 to –329 (FHA). We have since upheld the constitutionality of the FHA. *Hills Dev. Co. v. Bernards Township*, 103 *N.J.* 1, 25, 510 *A.*2d 621 (1986).

The cases that comprise this appeal arise out of attempts by several municipalities to comply with their obligation to provide a realistic opportunity for the construction of affordable housing under our ruling in *Mt. Laurel II* and the provisions of the FHA. The Townships of Chester, South Brunswick, Holmdel, Middletown, and Cherry Hill all adopted ordinances to provide for low- and moderate-income housing. The ordinances, in varying forms, impose fees on developers as a condition for development approval. The fees are dedicated to an affordable-housing trust fund to be used in satisfying the municipality's *Mt. Laurel* obligation.

Several builders' associations initiated suits challenging those ordinances, claiming that each was an *ultra vires* act, exceeding the authority of the zoning and police powers and the Fair Housing Act; an invalid tax in violation of the uniform property taxation requirement of the New Jersey Constitution; a taking without just compensation in violation of both the United States and New Jersey Constitutions; and a denial of due process and equal protection in violation of both the United States and New Jersey Constitutions. Plaintiff New Jersey Builders Association sought a refund of the monies paid into the Chester Township affordable-housing trust fund plus accrued interest.

The trial courts in each case except *Cherry Hill* ruled that the ordinance at issue was facially unconstitutional because it imposed an unauthorized tax on a select group of individuals. The trial court in *Chester* also held that the New Jersey Builders Association lacked standing to seek a refund on behalf

of its members. The courts did not address the due-process, equal-protection, and taking claims. In each case except *Cherry Hill*, they granted summary judgment to plaintiffs. In denying plaintiff's summary-judgment motion in *Cherry Hill*, the trial court ruled that the ordinance was constitutional and within the scope of municipal power. We denied the unsuccessful defendants' motions for direct certification.

Defendants, and Cherry Hill as intervenor, appealed the grants of summary judgment on the substantive issues, and plaintiff New Jersey Builders Association cross-appealed on the standing issue. Consolidating the cases on appeal, the Appellate Division affirmed each case except *Holmdel*. The Appellate Division concluded that mandatory provisions for "in lieu" development fees are unauthorized revenue-raising devices. *Holmdel Builders Ass'n v. Township of Holmdel*, 232 *N.J.Super*. 182, 193, 556 *A*.2d 1236 (App.Div.1989). As such, it deemed mandatory development fees invalid taxes. It agreed with the trial courts that shifting a public responsibility to a limited segment of the community violates the State Constitution's rule of uniform taxation. *Id.* at 193–94, 556 *A*.2d 1236. The court further concluded that ordinances requiring mandatory set-asides are valid only if accompanied by zoning incentives, such as a density bonus, that bear a reasonable relationship to the cost incurred in constructing the mandatory-set-aside housing. *Id.* at 201, 556 *A*.2d 1236. The court ruled that a voluntary provision allowing a developer to choose between constructing affordable housing or paying an "in lieu" development fee into an affordable-housing trust fund is valid provided that the fee bears a reasonable relationship to the benefits conferred by the density bonus. *Ibid.* With respect to the cross-appeal, the Appellate Division determined that a trade organization does not have standing to seek a refund on behalf of its members. *Id.* at 204, 556 *A*.2d 1236.

Accordingly, the Appellate Division ruled that the ordinances of the Townships of Chester and South Brunswick, which require payment of a mandatory development fee, were invalid

because they imposed an unauthorized tax. Middletown Township's ordinance was held invalid because one section imposed a mandatory development fee, while another section required a mandatory set-aside without providing a compensating benefit. The court concluded that the voluntary nature of Holmdel's ordinance and its optional provision for an increase in density, giving the developer a compensating benefit, was facially valid; it remanded the Holmdel case for a plenary hearing with respect to the validity of Holmdel's ordinance as applied. The Appellate Division did not rule on intervenor Cherry Hill's ordinance.

We granted defendants' and intervenor's petitions, as well as the cross-petitions for certification of plaintiffs New Jersey Builders Association and Holmdel Builders Association. 117 *N.J.* 150, 151, 564 *A*.2d 871, 872 (1989). We also granted motions for leave to submit *amicus* briefs by the Public Advocate, the Civic League of Greater New Brunswick and the League of Women Voters, and Princeton Township.

This appeal raises two major substantive issues. One is whether there is statutory authority, derived from the FHA, the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –129, and the general police power of government, *N.J.S.A.* 40:48–2, that enables a municipality to impose affordable-housing development fees as a condition for development approval. That issue raises the related questions whether the development-fee ordinances constitute an impermissible taking of property or violate substantive due process or equal protection. The second major issue is whether affordable-housing development fees are an unconstitutional form of taxation. Finally, if these ordinances are invalid, the appeal presents the issue whether a trade organization has standing to seek a refund on behalf of its members.

I.

Resolution of these several issues requires initially a presentation of the municipal ordinances involved in this case. It is

also important to explain the statutory and administrative framework structured by the FHA within which these ordinances were adopted and the role of the Council on Affordable Housing (COAH or the Council), the administrative agency created under the FHA, in the adoption of local ordinances designed to fulfill a municipal fair-share affordable-housing obligation.

Chester Township's *Mt. Laurel* obligation is limited to indigenous need. Accordingly, the Township amended its zoning ordinance to address its *Mt. Laurel* obligation. The purpose of the ordinance is to require all new development to share in the cost of *Mt. Laurel* compliance. The ordinance creates an affordable-housing trust fund and imposes a mandatory development fee on all new commercial and residential development as a condition for receiving a certificate of occupancy. New developments that are "identified as the type of construction which assists the Township in satisfying its affordable housing obligations under Mt. Laurel II" do not pay the fees. The ordinance specifically states that the purposes of the affordable-housing trust fund are:

> To provide technical and financial assistance where needed, to small lot owners to encourage them to develop quality, low-cost housing;
> To develop low-cost housing directly;
> To provide assistance to the Township in managing the low-cost housing program;
> To provide a working fund of capital to be used as grants, subsidies, or loans as may be required to help meet the Township's obligation under Mt. Laurel II.

The amount of the fee varies in accordance with the proposed size of the development, ranging from twenty-five cents to seventy-five cents per square foot. Because the Township has determined that rehabilitating existing affordable units is the best way to satisfy its indigenous-need obligation, it does not give developers the option of constructing affordable housing.

South Brunswick Township concluded that "the constitutional obligation to provide affordable housing should apply not merely to those owners of tracts specifically rezoned for meeting this obligation, but rather to the developers of other residential,

commercial or industrial property," and therefore adopted a zoning ordinance creating an affordable-housing trust fund. The ordinance imposes development fees on all new commercial and non-inclusionary residential development as a condition for site-plan or subdivision approval. The fees for non-inclusionary residential developments are calculated on the basis of the proposed size of the development. The fees for non-residential developments depend on the type of project involved, ranging from twenty-five to fifty cents per square foot. The municipality's stated purpose in creating the fund is to rehabilitate substandard housing and thus provide its fair share of affordable housing.

Middletown Township determined, in light of the need for affordable housing created by employment and growth patterns, that all new development should share "in the cost of that portion of the present and future [*Mt. Laurel*] obligation attributable directly or indirectly to the development." It adopted an ordinance requiring all new major residential-subdivision and site-plan applications to set aside seven percent of the development's total dwelling units for lower-income housing. On residential tracts other than those zoned specifically for inclusionary development, a developer may make a cash contribution to the affordable-housing trust fund in lieu of actually constructing the affordable units. The fee ranges from eighty cents to $1.80 per square foot, depending on the total gross floor area. All non-residential developers are required to pay a development fee into the fund. Density bonuses do not accompany the mandatory set-aside requirement, the fee-in-lieu option, or the mandatory-fee requirement. The trust-fund contributions are to be used to produce affordable housing. Production includes "the construction, rehabilitation, purchase for resale, direct subsidy, land acquisition, or mortgage financing of housing affordable for purchase or rental by lower income households as well as the funding of Regional Contribution Agreements."

Holmdel Township's zoning ordinance, prior to 1986, permitted a maximum density of .8 dwelling units per acre in the R–40A residential zone. In 1986, an amendment to the ordinance re-zoned a portion of the R–40A zone to create an R–40B zone. The R–40B zone downgraded density from .8 to .4 units per acre. A developer may build .6 units per acre, however, if he or she contributes the equivalent of 2.5% of the purchase price of all units to the municipality's affordable-housing trust fund. The trust fund is used only for "those purposes that produce a direct benefit to the production of either a higher ratio of lower income units in a given project, a reduction in the cost of producing lower income units that shall be passed on to the purchaser or tenant of the unit, or the direct construction of units such as township-sponsored project[s]."

Cherry Hill Township's *Mt. Laurel* obligation is not limited to indigenous need. The Township claims it is approaching "total build out," and therefore adopted a housing impact-fee ordinance. Building permits are issued only for those developments that pay an impact fee into the affordable-housing trust fund. Inclusionary developments and small, inexpensive, single-family detached houses are exempt from the fee requirement. Otherwise, residential developments are assessed a fee based on the proposed size of the project, and commercial development is assessed a fee based on a percentage of the cost of construction. The trust fund is to be used "at the discretion of the Township for the sole purpose of aiding in the provision or rehabilitation of modest income housing."

In sum, the Townships of Chester and South Brunswick have enacted ordinances that impose a mandatory development fee on all new non-inclusionary developments as a condition for development approval. Their ordinances do not give developers a density bonus in exchange for the development fee. Middletown Township's ordinance imposes a mandatory development fee on all new commercial development as a condition for development approval. Non-inclusionary residential developers may choose between constructing the affordable housing or

paying an in-lieu fee. Density bonuses do not accompany any of the options. Holmdel Township enacted an ordinance that gives developers a density bonus if they contribute to an affordable-housing trust fund. Cherry Hill Township's ordinance imposes a mandatory development fee on all new commercial developments and non-inclusionary residential developments of a sufficient size.

We consider these ordinances in the context of the FHA, which substantially codified the *Mt. Laurel* doctrine. The Council on Affordable Housing is the agency constituted to implement the FHA. It plays a critical role in the adoption of ordinances that address municipal affordable-housing needs. Every municipality with an affordable-housing obligation must submit to COAH for approval its plan to meet that need. Each of the municipalities involved here has received substantive certification of its housing-plan element following COAH review. The affordable-housing development fees authorized by the ordinances that are the subject of this appeal clearly bear on each municipality's housing-plan element. COAH, however, ruled that the housing-plan element of each municipality was valid aside from those ordinances.

## II.

Any inquiry into the validity of development-fee ordinances must inevitably consider the complex factors that contribute to the persistent and substantial shortage of low- and moderate-income housing (hereafter, lower-income or affordable housing). This inquiry necessarily begins with our seminal decisions in *Mt. Laurel I* and *Mt. Laurel II.*

■ The core of those decisions is that *every* municipality, not just developing municipalities, must provide a *realistic*, not just a theoretical, opportunity for the construction of lower-income housing. We realized that the solution to the shortage of affordable housing could not "depend on the inclination of developers to help the poor, [but rather must rely] on affirma-

tive inducements to make the opportunity real." *Id.*, 92 *N.J.* at 261, 456 *A.*2d 390. The principal mode of compliance suggested in *Mt. Laurel II* was mandatory set-asides. We flatly rejected claims that such inclusionary measures amount to a taking without just compensation and an impermissible socio-economic use of the zoning power, concluding that "the builder who undertakes a project that includes a mandatory set-aside voluntarily assumes the financial burden, if there is one, of that condition." *Id.* at 267 n. 30, 456 *A.*2d 390. However, we never envisaged mandatory set-asides as the exclusive solution for the dearth of lower-income housing. In *Mt. Laurel II,* we encouraged municipalities "to create other devices and methods for meeting fair share obligations." 92 *N.J.* at 265–66, 456 *A.*2d 390.

The solutions proposed in *Mt. Laurel II* to meet the critical shortage of affordable housing were strongly influenced by the Court's perception of the causes of that shortage. We noted that the flight of industry and commerce from urban to suburban areas is largely responsible for the social ill that the *Mt. Laurel* doctrine is intended to address.

[S]ince World War II there has been a great movement of commerce, industry, and people out of the inner cities and into the suburbs. At the same time, however, exclusionary zoning made these suburbs largely inaccessible to lower income households. Beside depriving the urban poor of an opportunity to share in the suburban development, this exclusion also increased the relative concentration of the poor in the cities and thereby hastened the flight of business and the middle class to the suburbs. A vicious cycle set in as increased business and middle class flight led to more urban decay, and more urban decay led to more flight, etc. [*Id.* at 210 n. 5, 456 *A.*2d 390.]

The phenomenon of unfettered non-residential development has exacerbated the need for lower-income housing, and has generated widespread efforts to link such needed residential development to non-residential development. Thus, nationwide, municipalities have attempted to shift the externalities of development to non-inclusionary developers. *See, e.g.,* Alterman, "Evaluating Linkage and Beyond: Letting the Windfall Genie Out of the Exactions Bottle," 34 *Wash. U.J. Urb. & Contemp. L.* 3, 7 (1988).

The broad concept of linkage describes any of a wide range of municipal regulations that condition the grant of development approval on the payment of funds to help finance services and facilities needed as a result of development. In the context of developing affordable housing, linkage refers to any scheme that requires developers to mitigate the adverse effects of non-residential development upon the shortage of housing either indirectly, by contributing to an affordable-housing trust fund, or directly, by actually constructing affordable housing. *See* A. Mallach, *Inclusionary Housing Programs: Policies and Practices* (1985). The idea of linking community housing goals with non-residential real estate development has inspired new governmental efforts to address the lower-income housing crisis. *See* Smith, "From Subdivision Improvement Requirements to Community Benefit Assessments and Linkage Payments: A Brief History of Land Development Exactions," 50 *Law & Contemp. Probs.* 5 (1987); Gallogly, "Opening the Door for Boston's Poor: Will 'Linkage' Survive Judicial Review?", 14 *Environmental Affairs* 447 (1987).

Affordable-housing linkage ordinances are the most recent phenomenon in this area. *See, e.g.,* Connors & High, "The Expanding Circle of Exactions: From Dedication to Linkage," 50 *Law & Contemp. Probs.* 69 (1987). Such ordinances link or couple the right to engage in non-residential development to the provision of affordable housing. The ordinances at issue in this appeal are all examples of linkage. Each requires certain developers to help finance the construction of affordable housing either as a condition for receiving permission to build or in order to obtain some type of density bonus. Only Holmdel's ordinance gives developers the option of actually constructing affordable-housing units.

The linkage trend has gained momentum during the past decade. *See* Symposium: Land–Use, Zoning, and Linkage Requirements Affecting the Pace of Urban Growth, 20 *Urban Lawyer* 513 (1988); Bauman & Ethier, "Development Exactions and Impact Fees: A Survey of American Practices," 50 *Law &*

*Contemp. Probs.* 51 (1987).[1] The fairness and legality of
linkage have inspired much debate among legal scholars, the
business community, and the judiciary. Proponents, including
*amicus curiae* Princeton Township, forcefully argue that by
attracting new residents to an area, commercial developments
increase the need for housing in general and thus for afforda-
ble housing. To the extent that the additional need for housing
is not met with increased supply, housing prices will be pushed
upward, exacerbating both the need for, and unattainability of,
lower-income housing. Therefore, it is appropriate for munici-
palities to charge commercial developers with a portion of the
responsibility for creating more affordable-housing units.
Gruen, "The Economics of Requiring Office–Space Develop-
ment to Contribute to the Production and/or Rehabilitation of
Housing," in D. Porter, *Downtown Linkages* (1985); *cf.* Sureni-
an, "Mount Laurel II and the Fair Housing Act," 319–23
(NJICLE 1987) (advocating linkage fees in theory but caution-
ing against fees in practice due to "ineffectiveness of
bureaucracy" and propensity of municipalities to evade fair-
share obligations). In addition, linkage advocates stress the
need to consider the effect of all development on the finite
supply of land. Land must be viewed as an essential but
exhaustible resource; any land that is developed for any pur-
pose reduces the supply of land capable of being used to build
affordable housing. *See* Major, "Linkage of Housing and Com-

---

[1]The most widely known, and most extensively studied, housing-payment
programs are the linkage programs in San Francisco and Boston. *See, e.g.,*
Tegeler, "Developer Payments and Downtown Housing Trust Funds," *Clearing-
house Rev.* 679 (Nov.1984). Both programs give developers the option of either
constructing affordable housing units or contributing a fee in lieu of construc-
tion into a housing trust fund. San Francisco's program applies to any new
development or substantial rehabilitation of more than 50,000 square feet. *See*
Keating, "Linking Downtown Development to Broader Community Goals," *APA
Journal* 133 (Spring 1986). Boston's program applies only to developments
greater than 100,000 square feet that require zoning relief. Kayden & Pollard,
"Linkage Ordinances and the Traditional Exactions Analysis: The Connection
Between Office Development and Housing," 50 *Law and Contemp. Probs.* 127
(1987).

mercial Development: The Legal Issues," 15 *Real Estate L.J.* 328, 331 (1987). The scarcity of land as a resource bears on the opportunity and means to provide affordable housing. *See Hills Dev. Co. v. Bernards Township, supra,* 103 *N.J.* at 61, 510 *A.*2d 621; *Tocco v. New Jersey Council on Affordable Hous.,* 242 *N.J.Super.* 218, 221, 576 *A.*2d 328 (App.Div.), *certif. denied,* —— *N.J.* ——, —— *A.*2d —— (1990).

*Amicus curiae* the Public Advocate argues that commercial developers ought not be exempt from the financial burden of *Mt. Laurel* compliance because their projects, like those of multifamily residential developers, consume land, water, and sewerage capacity that could otherwise be devoted to or held for the satisfaction of the municipality's lower-income-housing obligation. This Court has implicitly recognized that unrestrained nonresidential development can itself deepen the shortage of affordable housing. *Mt. Laurel II, supra,* 92 *N.J.* at 210 n. 5, 456 *A.*2d 390.

## III.

With that background, we address the issue whether the development-fee ordinances are statutorily authorized. The focal question in this case is whether any statutory grant of power to municipalities can fairly be construed as impliedly authorizing the affordable-housing development fees imposed by these ordinances. We are guided by the principle that municipalities possess "only such rights and powers as have been granted in express terms, or arise by necessary or fair implication, or are incident to the powers expressly conferred, or are essential to the declared objects and purposes of the municipality." *Edwards v. Mayor of Moonachie,* 3 *N.J.* 17, 22, 68 *A.*2d 744 (1949). The authority delegated to them, however, is to be construed liberally in their favor. *N.J. Const. of 1947* art. IV, § 7, para. 11; *Moyant v. Borough of Paramus,* 30 *N.J.* 528, 154 *A.*2d 9 (1959). We thus approach the issue in light of the statutory authority of the FHA, which deals expressly with

affordable housing. That explicit authority, however, must be comprehended in terms of the traditional zoning powers of municipalities, as reflected in the MLUL and the general police powers of municipal government. Hence, although it is the FHA that deals directly with affordable housing, it is instructive to consider initially the zoning and police powers.

### A.

The MLUL, which expresses the zoning powers delegated to local government, seeks generally "[t]o encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare." *N.J.S.A.* 40:55D–2. "It is plain beyond dispute that proper provision for adequate housing of all categories of people is certainly an absolute essential in promotion of the general welfare required in all local land use regulation." *Mt. Laurel I, supra,* 67 *N.J.* at 179, 336 *A.*2d 713.

■■ Affordable housing is a goal that is no longer merely implicit in the notion of the general welfare. It has been expressly recognized as a governmental end and codified under the FHA, which is to be construed *in pari materia* with the MLUL. *See Hills Dev. Co., supra,* 103 *N.J.* at 33–34, 510 *A.*2d 621. See discussion *infra* at 573–76. The FHA specifies that a municipality's zoning power be used to create a housing element "designed to achieve the goal of access to affordable housing to meet present and prospective housing needs, with particular attention to low and moderate income housing." *N.J.S.A.* 52:27D–310. Also, the municipality must "establish that its land use and other relevant ordinances have been revised to incorporate" provisions for a realistic opportunity for the development of lower-income housing. *N.J.S.A.* 52:27D–311a. We thus have no doubt that provision of lower-income housing is one of the purposes of zoning incorporated by reference into the zoning enabling act.

That understanding is not remarkable. Our zoning law "permits any reasonable scheme which comports with the legislative standards and thus leaves ample room for new ideas." *Kozesnik v. Montgomery Township*, 24 *N.J.* 154, 169, 131 *A.*2d 1 (1957). Courts consistently have taken an expansive view of the zoning power, subjecting it only to the overarching requirement of serving the general welfare. *E.g., Village of Belle Terre v. Boraas*, 416 *U.S.* 1, 94 *S.Ct.* 1536, 39 *L.Ed.*2d 797 (1974); *Village of Euclid v. Ambler Realty Co.*, 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303 (1926). Housing needs are clearly related to the general welfare under the zoning laws. *Berman v. Parker*, 348 *U.S.* 26, 33, 75 *S.Ct.* 98, 102, 99 *L.Ed.* 27, 38 (1954) ("We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive").

Further, the broad reach of the zoning authority arises from its character as an aspect of local government's police powers. It has repeatedly been acknowledged that the zoning power is part of the police power. *E.g., Mt. Laurel II, supra*, 92 *N.J.* at 208, 456 *A.*2d 390; *Mt. Laurel I, supra*, 67 *N.J.* at 174, 336 *A.*2d 713. The police power enables a municipality to take such actions "as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants." *N.J.S.A.* 40:48–2. A municipality in the exercise of its police power clearly may seek to address housing problems. *See, e.g., Dome Realty, Inc. v. City of Paterson*, 83 *N.J.* 212, 416 *A.*2d 334 (1980) (certificate of occupancy could be used to enforce housing standards); *Inganamort v. Borough of Fort Lee*, 62 *N.J.* 521, 303 *A.*2d 298 (1973) (rent control); *Apartment House Council v. Mayor of Ridgefield*, 123 *N.J.Super.* 87, 301 *A.*2d 484 (Law Div.1973) (owners of multiple dwellings required to post security with a municipal agency empowered to repair emergency housing conditions), *aff'd o.b.*, 128 *N.J.Super.* 192, 319 *A.*2d 507 (App.Div. 1974).

In addition to advancing a recognized purpose of zoning, a zoning ordinance must bear a "real and substantial relationship to the regulation of land." *State v. C.I.B. Int'l,* 83 *N.J.* 262, 271 n. 4, 416 *A.*2d 362 (1980). Defendants here contend that a zoning ordinance imposing a development fee to provide affordable housing can be considered a form of inclusionary zoning and thus bears a real and substantial relationship to the regulation of land. The Appellate Division disagreed, ruling that "[a] mandatory development fee [as opposed to a voluntary-development fee] applied indiscriminately as a price to build within the municipality has no real and substantial relationship to the regulation of land." 232 *N.J.Super.* at 194–95, 556 *A.*2d 1236.

In *Mt. Laurel II,* we held that inclusionary-zoning devices that serve the purpose of providing affordable housing within a region bear a real and substantial relationship to the regulation of land and the zoning power. 92 *N.J.* at 271, 456 *A.*2d 390. The fact that defendants seek to accomplish the general-welfare goal of affordable housing by development fees rather than by mandatory set-asides does not negate a "real and substantial relationship" of such development fees to the regulation of land. Although development-fee measures are not site-specific in the same sense as mandatory set-asides, they implicate land-related regulations because they are specifically designed and applied to aid in the creation of affordable residential housing. *See N.J.S.A.* 52:27D–312 (municipality may satisfy portion of its fair-share requirement through "regional contribution agreement" with another municipality).

Development fees expressly dedicated to lower-income housing will thus affect "the nature and extent of the uses of land and of buildings and structures thereon," *N.J.S.A.* 40:55D–2k. As compared with relatively random and rigid set-aside zoning, development fees provide a more flexible and comprehensive approach that will encourage the appropriate use and development of land within a municipality to satisfy that municipality's

fair-share housing obligation. *Mt. Laurel II*, 92 *N.J.* at 214–15, 456 *A.*2d 390.

We have also required that a zoning ordinance advance an authorized purpose "in a manner permitted by the legislature." *C.I.B. Int'l*, *supra*, 83 *N.J.* at 271 n. 4, 416 *A.*2d 362. Plaintiffs argue that linkage fees constitute an impermissible form of exactions because they seek to require developers to provide for off-site public needs that have not been caused by their developments and furnish them no benefits. *See Divan Builders v. Planning Bd. of Wayne Township*, 66 *N.J.* 582, 598, 334 *A.*2d 30 (1975) (developer "could be compelled only to bear that portion of the cost [of off-site improvements] which bears a rational nexus to the needs created by and benefits conferred upon, the subdivision"); *New Jersey Builders Ass'n v. Mayor of Bernards Township*, 108 *N.J.* 223, 237, 528 *A.*2d 555 (1987) (municipal authority to charge developers limited "only to improvements the need for which arose as a direct consequence of the particular subdivision or development under review"); *see also N.J.S.A.* 40:55D–42 (developer can be required "to pay his pro rata share of the cost of providing only reasonable and necessary street improvements and water, sewerage and drainage facilities" located off-site). Because we have uniformly required a strong nexus between development and off-site improvements, plaintiffs contend that the development fees are prohibited. Although the Appellate Division found that *N.J.S.A.* 40:55D–42 does not specifically govern the development-fee ordinances at issue in this case, it determined that the development fees were variant forms of off-site exactions and invalid. 232 *N.J.Super.* at 198, 556 *A.*2d 1236.

In the context of off-site improvements, an exaction generally requires developers to supply or finance public facilities or amenities made necessary by proposed development. *See*

Smith, *supra*, 50 *Law & Contemp. Probs.* 5.[2] We have tradi-
tionally required a strong, almost but-for, causal nexus between
off-site public facilities and private development in order to
justify exactions. That nexus achieves two ends. First, it
ensures that a developer pays for improvement that is necessi-
tated by the development itself, *Divan Builders, supra*, 66 *N.J.*
at 601, 334 *A.*2d 30, or is a "direct consequence" of the
development, *New Jersey Builders Ass'n, supra*, 108 *N.J.* at
237, 528 *A.*2d 555. Second, it protects a developer from paying
a disproportionate share of the cost of improvements that also
benefit other persons. *Longridge Builders, Inc. v. Planning
Bd. of Princeton Township*, 52 *N.J.* 348, 350, 245 *A.*2d 336
(1968); *see also N.J.S.A.* 40:56-27 (special assessments may be
imposed on property owners only for unique or special bene-
fits); *Meglino v. Township Comm. of the Township of Eagles-
wood*, 103 *N.J.* 144, 161, 510 *A.*2d 1134 (1986) (special assess-
ments in excess of benefit to particular properties violate both
enabling legislation and takings clause); *McNally v. Township
of Teaneck, supra*, 75 *N.J.* 33, 43, 379 *A.*2d 446 (1977) (same).

Those commentators who believe that affordable-housing
linkage measures are essentially a type of exaction for off-site
improvements generally assume that a similar causal link is

---

[2]The case law on exactions is extensive and varies considerably from state to
state, particularly concerning the degree to which the exaction must be related
to the needs generated by the development. Different standards can be
distilled from the cases litigated in various state courts. The most stringent
standard is that of the Illinois Supreme Court, which has allowed only those
exactions that are "specifically and uniquely attributable" to the development.
*Pioneer Trust & Sav. Bank v. Village of Mount Prospect*, 22 *Ill.*2d 375, 379, 176
*N.E.*2d 799, 802 (1961). Many states have adopted broader positions, uphold-
ing exactions so long as a reasonable connection can be shown between the
need for additional facilities and the growth generated by development. *See,
e.g., Associated Home Builders v. Walnut Creek*, 4 *Cal.*3d 633, 94 *Cal.Rptr.* 630,
484 *P.*2d 606 (1971); *Contractors & Builders Ass'n of Pinellas County v. Dune-
din*, 329 *So.*2d 314 (Fla.1976) (upholding sewer and water impact fees); *Jordan
v. Village of Menomonee Falls*, 28 *Wis.*2d 608, 137 *N.W.*2d 442 (1965) (uphold-
ing school and park land dedication or in-lieu fee), *appeal dismissed*, 385 *U.S.*
4, 87 *S.Ct.* 36, 17 *L.Ed.*2d 3 (1966).

572

required and exists between new commercial space and an increased demand for lower-income housing. *See* Merriam & Andrews, "Defensible Linkage," 54 *J. Am. Plan. A.* 199 (1988); Bosselman & Stroud, "Mandatory Tithes: The Legality of Land Development Linkage," 17 *Land Use and Envtl. L. Rev.* 151 (1986). We do not believe, however, that the development-fee ordinances before us must be founded on a stringent nexus between commercial construction and the need for affordable housing. We find a sound basis to support a legislative judgment that there is a reasonable relationship between unrestrained nonresidential development and the need for affordable residential development. We do not equate such a reasonable relationship with the strict rational-nexus standard that demands a but-for causal connection or direct consequential relationship between the private activity that gives rise to the exaction and the public activity to which it is applied. Rather, the relationship is to be founded on the actual, albeit indirect and general, impact that such nonresidential development has on both the need for lower-income residential development and on the opportunity and capacity of municipalities to meet that need. Inclusionary zoning itself is based on that relationship. Such zoning measures are designed to reach all land development, to address the potential diminishment of affordable housing, and to encourage within the municipality, the region, and the state the creation of affordable housing. Such governmental measures are thus not analogous to specific off-site infrastructure improvements occasioned by a particular development.

We conclude that the rational-nexus test is not apposite in determining the validity of inclusionary zoning devices generally or of affordable-housing development fees in particular. *See Mt. Laurel II*, 92 *N.J.* at 260, 456 *A.*2d 390; *In re Egg Harbor Assocs.*, 185 *N.J.Super.* 507, 523, 449 *A.*2d 1324 (App.Div.1982) (reasonable relationship, rather than rational-nexus, test appropriate in evaluating validity of land-use requirements), *aff'd*, 94 *N.J.* 358, 464 *A.*2d 1115 (1983). Inclusionary zoning through

the imposition of development fees is permissible because such fees are conducive to the creation of a realistic opportunity for the development of affordable housing; development fees are the functional equivalent of mandatory set-asides; and it is fair and reasonable to impose such fee requirements on private developers when they possess, enjoy, and consume land, which constitutes the primary resource for housing. *Mt. Laurel II, supra,* 92 *N.J.* at 274, 456 *A.*2d 390. Such measures do not offend the zoning laws or the police powers.

### B.

■ The nature and extent of authority to provide affordable housing under zoning laws and general police powers is inextricably related to the FHA. The FHA takes on added and independent significance in our consideration of the validity of the development-fee ordinances because it deals directly with the provision of lower-income housing.

The FHA does not expressly authorize a municipality to impose development fees as a means to provide lower-income housing. Nevertheless, the FHA confers on a municipality a broad range of general powers, including the authority "to provide for its fair share of low and moderate income housing by means of any technique or combination of techniques which provide a realistic opportunity for the provision of [its] fair share." *N.J.S.A.* 52:27D–311a. The Appellate Division concluded that the FHA did not authorize mandatory development fees, 232 *N.J.Super.* at 195, 556 *A.*2d 1236, but under certain circumstances did authorize ordinances that include a provision for a voluntary in-lieu development fee. *Id.* at 196–201, 556 *A.*2d 1236.

Because the statute states that a municipality does not have to expend municipal revenue to provide affordable housing, it is evident that the Legislature has determined that affordable housing does not have to be provided directly by local government. *N.J.S.A.* 52:27D–311d. However, contrary to the find-

ing of the Appellate Division, it does not follow that the Legislature did not impliedly authorize the use by local government of inclusionary-zoning devices such as mandatory development fees to generate affordable housing.

The use of development fees is not countermanded by current regulatory policy. The understanding of legislation by the administrative agency responsible for its implementation can be most instructive in ascertaining legislative intent and statutory meaning. *Malone v. Fender,* 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979). Here, deference to the Council's application of the FHA "is especially appropriate because the agency is charged with the implementation of [that] ... innovative legislative response to deal with the statewide need for affordable housing." *Van Dalen v. Washington Township,* 120 *N.J.* 234, 246, 576 *A.*2d 819 (1990) (citation omitted). Under the FHA, municipal measures that are simply variants of a COAH-approved method are valid. *N.J.S.A.* 52:27D–311a. In this case, mandatory development fees are similar to or may be analogized to the voluntary fees currently approved by COAH in certain limited circumstances. *See, e.g., N.J.A.C.* 5:92–8.4. Mandatory development fees that do not violate COAH requirements and otherwise meet standards of reasonableness are not inconsistent with the FHA. They may be fairly regarded as "other techniques proposed by the municipality." *N.J.S.A.* 52:27D–311.

The Appellate Division's view was that development fees must be compensated by density bonuses, 232 *N.J.Super.* at 196–97, 556 *A.*2d 1236. However; nothing in the FHA expressly or literally prohibits such uncompensated fees; nor is any such prohibition indicated by the statute's legislative history. That history is germane to a search for legislative meaning. *Levin v. Township of Parsippany–Troy Hills,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). Prior to enacting the FHA, the Legislature proposed various bills to respond to *Mt. Laurel II.* Those bills reflected legislative concerns, but did not demonstrate any legislative consensus, over the use of density bonuses to meet the *Mt. Laurel* obligation. For example, the original draft of

bill S.2046, which ultimately was amended to become the FHA, included a provision to authorize density bonuses for developers in exchange for set-asides or for in-lieu payments. The subsequent Senate Committee Substitute bill contained no express provision for a fee on new non-inclusionary developments. After enactment of the FHA, the Assembly introduced a bill in 1986, A.2620, that would have expressly authorized the establishment of an affordable-housing trust fund—not dependent on the grant of density bonuses—as a condition of site-plan or subdivision approval.

Such unenacted provisions concerning bonuses do not compel any particular conclusion about the Legislature's views on development-fee schemes without bonuses. Enacted legislation may express more generally what was expressed more specifically in proposed legislation. *Jersey City Chapter of Property Owner's Protective Ass'n v. City Council of Jersey City*, 55 *N.J.* 86, 95, 259 *A.*2d 698 (1969) (quoting *J.R. Christ Constr. Co. v. Willete Assocs.*, 47 *N.J.* 473, 480, 221 *A.*2d 538 (1966)). Thus, although the FHA does not specifically authorize development-fee payments without correlative bonuses, this does not necessarily preclude finding such authority by reasonable implication.

Arguments in support of such implied authority for development fees without bonuses can also be drawn from the analogy between development fees and set-asides. Although we observed in *Mt. Laurel II* that the mandatory set-aside would have to assure developers "an adequate return on their investments," 92 *N.J.* at 268, 456 *A.*2d 390, neither *Mt. Laurel II* nor the FHA explicitly requires that a density bonus accompany a mandatory set-aside. *Cf. Van Dalen v. Washington Township*, 205 *N.J.Super.* 308, 342–45, 500 *A.*2d 776 (Law Div.1984) (holding unconstitutional a mobile-home zoning set-aside that imposed an unfair burden in form of discriminatory subsidies on middle-income residents). As noted earlier, *Mt. Laurel II* identified two illustrative zoning techniques that a municipality could use to satisfy its constitutional obligation: incentive zon-

ing such as density bonuses and mandatory set-asides. We expressed a preference for mandatory set-asides because that device serves to ensure the provision of affordable housing. 92 *N.J.* at 267–68, 456 *A.*2d 390. Development fees are the functional equivalent of mandatory set-aside schemes authorized by *Mt. Laurel II* and the FHA, *N.J.S.A.* 52:27D–311a(1). This Court has before held in another context that the authority to compel performance implies the authority alternatively to charge a fee to secure performance. *See In re Kimber Petroleum Corp.*, 110 *N.J.* 69, 74–75, 539 *A.*2d 1181 (1988) (DEP's power to compel polluter to initiate clean-up implies power alternatively to exact money from polluter equal to cost of clean-up).

Nevertheless, we do not determine the validity of uncompensated fees as applied by the municipalities in the cases now before us. It cannot be overstressed that the Legislature, through the FHA, intended to leave the specific methods of compliance with *Mt. Laurel* in the hands of COAH and the municipalities, charging COAH with the singular responsibility for implementing the statute and developing the state's regulatory policy for affordable housing. *Van Dalen v. Washington Township, supra,* 120 *N.J.* 234, 576 *A.*2d 819. Hence, although we conclude that the FHA's broad delegation of authority provides a statutory basis for development fees as permissible inclusionary zoning devices, it remains to COAH in the first instance to develop a comprehensive system of development fees.

## C.

We noted at the outset that it was relevant to consider COAH's unique role in the adoption of municipal ordinances that effectuate local fair-share housing plans. See discussion *supra* at 562. In determining the validity of the municipal development-fee ordinances in this case, we must focus on COAH's regulatory responsibility under the FHA. This poses

an issue not raised and, understandably, not anticipated by the parties.

Pursuant to the authority delegated by the Legislature, COAH acts as the administrative regulator in the field of affordable housing. The FHA vests the Council with "primary jurisdiction [over] the administration of housing obligations." *N.J.S.A.* 52:27D–304(a). "The power of the Council is extremely broad." *Hills Dev. Co., supra*, 103 *N.J.* at 32, 510 *A.*2d 621; *Van Dalen, supra*, 120 *N.J.* at 245, 576 *A.*2d 819. COAH is vested with wide powers and broad jurisdiction to resolve lower-income-housing problems. Franzese, "Mount Laurel III: The New Jersey Supreme Court's Judicious Retreat," 18 *Seton Hall L. Rev.* 30, 36–37 (1988). COAH is empowered by the FHA "to decide whether ... proposed ordinances and related planning steps will satisfy a particular community's *Mount Laurel* obligations." *Tocco v. New Jersey Council on Affordable Hous., supra*, 242 *N.J.Super.* at 221, 576 *A.*2d 328. It may require municipalities to preserve land as a scarce resource to meet affordable housing needs. *N.J.A.C.* 5:91–11.1; *Hills Dev. Co., supra*, 103 *N.J.* at 61, 510 *A.*2d 621; *Tocco v. Council on Affordable Hous., supra*, 242 *N.J.Super.* at 221, 224, 576 *A.*2d 328. COAH has the duty to determine and adjust a municipality's fair-share obligation. *N.J.S.A.* 52:27D–307. It has the power to establish "affordable housing programs to assist municipalities in meeting the obligation of developing communities to provide low and moderate income housing." *N.J.S.A.* 52:27D–321. The Council is authorized to approve the methods of implementing municipalities' housing elements and fair-share plans, *N.J.S.A.* 52:27D–314, including approval of any regional contribution agreements, *N.J.S.A.* 52:27D–312.

The breadth of the legislative mandate and the statutory standards creating COAH's regulatory authority comport with the complexity and sensitivity of the subject of affordable housing. COAH has undertaken to define a statutory public policy of affordable housing through the enactment of rules and regulations. This is consistent with the judicial recognition

that agency rulemaking may be necessary both "to inform the public and guide the agency in discharging its authorized function." *Lower Main Street Assocs. v. New Jersey Hous. & Mortgage Fin. Agency,* 114 *N.J.* 226, 235, 553 *A.*2d 798 (1989). Administrative rulemaking serves the interests of fairness and due process. Administrative agencies should inform the public and, through rules, "articulate the standards and principles that govern their discretionary decision in as much detail as possible." *Crema v. DEP,* 94 *N.J.* 286, 301, 463 *A.*2d 910 (1983). Rulemaking is also important to assure the faithful effectuation of the legislative mandate. *DEP v. Stavola,* 103 *N.J.* 425, 436–38, 511 *A.*2d 622 (1986); *Department of Labor v. Titan Constr. Co.,* 102 *N.J.* 1, 12–18, 504 *A.*2d 7 (1985).

We therefore conclude that agency rulemaking is reasonably required in order to fulfill the legislative purpose of the FHA with respect to inclusionary-zoning measures. We further conclude that COAH's exercise of its rulemaking authority in the area of inclusionary zoning is incomplete because COAH has not yet specifically addressed mandatory development fees as available inclusionary zoning devices. *See Lower Main Street Assocs. v. New Jersey Hous. & Mortgage Fin. Agency, supra,* 114 *N.J.* 226, 553 *A.*2d 798.

COAH has adopted regulations governing the grant of substantive certification of a municipality's housing element and fair-share plan. Those regulations authorize certification if the municipal proposal is "consistent with achievement of the low and moderate income housing needs of the region," *N.J.A.C.* 5:91–6.1; if it eliminates unnecessary features of land-use ordinances that create higher housing costs, *ibid.;* and if it provides affirmative measures to make the achievement of the municipality's fair share a reasonable possibility. *N.J.A.C.* 5:91–10.1. In determining a municipality's ability to satisfy its *Mt. Laurel* obligation through inclusionary development, "[t]he Council presumptively requires a 20 percent maximum set-aside and a minimum gross density of six units per acre on vacant developable sites." *N.J.A.C.* 5:92–8.4(c). Under certain circum-

stances a municipality may deviate from the presumptive requirements. For example, if "the market units are single family detached dwellings [the municipality's agreement] may provide that, in exchange for an increase over existing density, the developer either: construct low and moderate income units as part of an inclusionary development; or pay a voluntary fee to be utilized by the municipality for a [Regional Contribution Agreement] or municipally constructed low and moderate income housing or rehabilitation." *N.J.A.C.* 5:92–8.4(e).

COAH has not, however, adopted any regulation dealing with mandatory development fees as available inclusionary zoning measures. Nevertheless, we are informed that COAH itself has specifically considered, within the context of municipal fair-share adjustments, the possibility of imposing mandatory development fees. Further, even in the absence of a specific or detailed regulation, COAH has taken action in these cases that suggests an understanding that these measures are not invalid or *ultra vires*. COAH has expressly approved the housing elements and fair-share plans of the defendant municipalities, although in granting substantive certification to the municipalities in this case, COAH did not rule on the development-fee ordinances, concluding that the ordinances as such were "not required to implement the fair share plan." However, as we view the matter, each ordinance has a direct and material bearing on the municipality's effort to meet its fair-share affordable-housing obligation. Consequently, the development-fee ordinances were subject to review and certification by COAH as a constituent part of the housing-element plan of the respective municipalities.

Accordingly, we determine that COAH, through its rulemaking procedures, should specify standards for development fees, so that municipalities may consider employing such fees as inclusionary-zoning devices in designing their housing elements under the FHA. Regulatory standards will enable us to determine that persons subject to such ordinances have been reasonably informed of their obligations, and that both municipalities

and COAH in the adoption and approval of such ordinances are acting in conformity with the legislative intent of the FHA.

Such regulations will define more precisely the impact and effect of development fees. They presumably will address the types of developments that will be subject to fees, the amount and nature of the fees imposed, the relationship of fees to other inclusionary-zoning measures such as mandatory set-asides and density bonuses, the conditions for the creation and administration of affordable-housing trust funds, the requirements for the use and application of such funds, and whether a system of development fees should include counterbalancing density bonuses. As already noted, in its current authorization of development fees on residential developers, COAH has determined that a municipality may counterbalance such fees with density bonuses; e.g., N.J.A.C. 5:92–8.4(e). In its consideration of non-residential development fees, COAH might well choose to follow this approach. Because we cannot and should not prognosticate what scheme COAH will devise for non-residential development fees, we do not determine on the present record whether development fees without bonuses might or might not in a particular application be constitutionally objectionable.

COAH, in the exercise of sound administrative discretion, should consider the desirability and feasibility of such development fees in the broader context of the State's affordable housing policy. Development fees can be a valuable alternative that some municipalities desire to employ in fulfilling their Mt. Laurel obligations. Moreover, such fees should be considered constituent parts of local housing elements designed to meet municipal affordable-housing obligations under the FHA. Thus, COAH's regulatory responsibility in this area must be acknowledged. Accordingly, we anticipate that COAH will properly discharge this responsibility by promulgating appropriate development-fee regulations. In the absence of such regulations, we are constrained to set aside the ordinances at issue in this appeal.

## IV.

Plaintiffs present related claims that the development-fee ordinances violate constitutional standards pertaining to the taking of property, due process, and equal protection. These contentions need not be addressed on their merits in view of our determination that municipal inclusionary zoning measures consisting of development fees for lower-income housing must be adopted in accordance with duly promulgated administrative regulations. We nevertheless observe that insofar as those contentions are addressed to the facial validity of the development-fee ordinances in these cases, they do not have merit.

 The claims based on alleged violations of due process and equal protection standards by development-fee ordinances do not project new or additional substantive considerations. Because plaintiffs do not allege that they are a member of a suspect class, *see New Orleans v. Dukes,* 427 *U.S.* 297, 304, 96 *S.Ct.* 2513, 2517, 49 *L.Ed.*2d 511, 517 (1976), those contentions can be answered sufficiently, for present purposes, by reference to the validity of those measures as reasonable exercises of statutory zoning and police powers. See discussion *supra,* at 566–73.

Further, central to those several claims is the allegation that development fees are confiscatory. The Appellate Division, believing that the fees were unfair or confiscatory, concluded that those constitutional violations would be rectified if developers received compensatory benefits. 232 *N.J.Super.* at 201, 556 *A.*2d 1236.

In response to similar claims in *Mt. Laurel II* that mandatory set-asides were confiscatory, this Court stated that "the builder who undertakes a project that includes a mandatory set-aside voluntarily assumes the financial burden, if there is any, of that condition." 92 *N.J.* at 267 n. 30, 456 *A.*2d 390. A developer may be made to bear the economic burdens of providing affordable housing so long as those burdens are not excessive and the project remains profitable. *See id.* at 279 n. 37, 456 *A.*2d 390 (a

twenty-percent set-aside may be a "reasonable minimum"); *N.J. A.C.* 5:92–8.4(c); *see also In re Egg Harbor Assocs., supra,* 94 *N.J.* at 358, 464 *A.*2d 1115 (specific plan for inclusionary zoning involving a 20% set-aside is "neither arbitrary nor unreasonable," nor an unconstitutional taking). In *Mt. Laurel II,* we suggested that "[w]here practical, a municipality should use mandatory set-asides even where [federal] subsidies are not available," 92 *N.J.* at 268, 456 *A.*2d 390, and that mandatory set-asides would be legitimate as long as developers were assured "an adequate return on their investments," *ibid.;* no density bonuses, compensatory benefits, or subsidies were specifically required.

Since initial authority for promulgating development-fee regulations lies with COAH, we do not reach the question of when, if ever, compensatory benefits might have to accompany mandatory development fees. As long as the measures promulgated are not confiscatory and do not result in an inadequate return of investment, there would be no constitutional injury. We leave it to COAH to determine initially the level at which fees might become confiscatory.

## V.

Plaintiffs' remaining major contention is that the affordable-housing development fees are a form of taxation and, as such, exceed delegated municipal revenue-raising authority in violation of the state constitutional command that all property taxes be levied uniformly. *N.J. Const. of 1947* art. VIII, § 1, para. 1.

Municipalities do not have the authority to raise general revenue except through "property taxes imposed pursuant to express and comprehensive legislative provisions." *Salomon v. Jersey City,* 12 *N.J.* 379, 384, 97 *A.*2d 405 (1953). If the primary purpose of the fee is to raise general revenue, it is a tax. *Daniels v. Borough of Point Pleasant,* 23 *N.J.* 357, 129 *A.*2d 265 (1957). If, however, the primary purpose is to reim-

burse the municipality for services reasonably related to development, it is a permissible regulatory exaction. *Id.; Bellington v. Township of East Windsor*, 17 *N.J.* 558, 565, 112 *A.*2d 268 (1955) (where primary purpose is regulatory, "it does not necessarily matter that the incidental result is revenue above the actual cost of supervision and control of the business; that is not enough to render the return a tax for revenue rather than a license tax").

In *Daniels, supra,* the municipality amended its building code to increase the fee for building permits. The fee was based on the square footage of the proposed structure. The Court invalidated the fees, finding that they did not bear a reasonable relationship to the costs of regulating construction, and concluded "that the purpose of increasing the building permit fees was to raise additional revenue made necessary primarily by increased school costs which were in turn caused by the increase in population resulting from the new buildings." 23 *N.J.* at 360, 129 *A.*2d 265. In *West Park Ave., Inc. v. Ocean Township*, 48 *N.J.* 122, 224 *A.*2d 1 (1966), we considered whether a development exaction could be imposed to create a trust fund for educational purposes. We concluded that the statute regulating subdivisions, *N.J.S.A.* 40:55–1.21, *repealed by L.*1975, *c.* 291, sec. 80, did not authorize the development exaction for an educational trust fund. *Id.* at 125–26, 224 *A.*2d 1.

The Appellate Division's reasoning in this case parallels the reasoning in those decisions. It viewed a municipality's obligation to provide lower-income housing as being comparable to its obligation to provide educational resources. 232 *N.J.Super.* at 193, 556 *A.*2d 1236. Because the general public, and not developers alone, must bear the financial burden of providing affordable housing, the Appellate Division concluded that mandatory development fees are taxes. *Ibid.*

Unlike public education that was directly at issue in *West Park Ave.,* and indirectly implicated in *Daniels,* the provision of

affordable housing is not a municipal obligation that must be supported through general taxation. The MLUL and FHA require a municipality to use its land-use regulations to create only the *realistic opportunity* for the development of low- and moderate-income housing. In *Mt. Laurel I*, we concluded that municipalities and developers had engaged in exclusionary practices that effectively precluded the development of low- and moderate-income housing in the suburbs. *Mt. Laurel II* required municipalities to use affirmative inclusionary-zoning measures, including mandatory set-asides, to redress affordable-housing needs. 92 *N.J.* at 267, 456 *A.*2d 390. Thus, a residential developer could be required to set aside a percentage of units to be used for low- and moderate-income housing. The Legislature, in effect, has ratified this principle. The FHA, as well as the MLUL, endorses the use of inclusionary-zoning techniques sanctioned in *Mt. Laurel II*.

We cannot overstress the similarities between mandatory set-asides and the development-fee ordinances. Because a mandatory set-aside requires a developer to allocate a percentage of units for lower-income housing, the requirement can be viewed as an exaction in kind, and, arguably, as a tax. *See* Ellickson, "The Irony of 'Inclusionary' Zoning", 54 *S.Cal.L.Rev.* 1167 (1981) (inclusionary zoning imposes a tax on new construction); *Bonan v. City of Boston*, 398 *Mass.* 315, 496 *N.E.*2d 640 (1986) (vacating on procedural grounds lower court holding that linkage fees closely resemble a tax, requiring express statutory authorization); *San Telmo Assocs. v. City of Seattle*, 108 *Wash.*2d 20, 735 *P.*2d 673 (1987) (ordinance restricting rights of low-income housing owners to convert to non-residential use deemed unconstitutional tax). In *Mt. Laurel II*, however, we determined that mandatory set-asides as a form of inclusionary zoning were not analogous to a tax. We viewed them as legitimate regulatory measures suitably addressed to the broad goals of zoning. Development fees, to reiterate, perform an identical function.

The Appellate Division also concluded that shifting the public responsibility for providing affordable housing to developers would violate the constitutional rule of uniformity in real property taxation. 232 *N.J.Super.* at 193–94, 556 *A.*2d 1236. If development fees are property taxes, arguably they may be constitutionally vulnerable because they apply to newly developed lands, exempting property that has already been developed, and therefore may lack the requisite uniformity. *See New Jersey State League of Municipalities v. Kimmelman,* 105 *N.J.* 422, 522 *A.*2d 430 (1987) (statute prohibiting newly-constructed single-family dwellings from being added to tax-assessment list until certificate of occupancy issued violated constitution). Nevertheless, the putative tax effect of any development fee scheme may turn on the nature and extent to which the property is burdened. *Cf. Prowitz v. Ridgefield Park Village,* 237 *N.J.Super.* 435, 568 *A.*2d 114 (App.Div.1989) (property tax assessment must account for affordable-housing requirements that limit resale value of units), *certif. granted,* 121 *N.J.* 666, 583 *A.*2d 350 (1990).

Although we do not regard development fees as a form of taxation, we stress that mandatory set-asides do not transgress the uniformity provision by imposing the responsibility of addressing the municipality's affordable-housing problems on developers of residential property. Ordinances that impose that responsibility on developers of commercial property and non-inclusionary residential property stand on the same footing.

In sum, because the development fees are a form of inclusionary zoning and similar to other land-use and related exactions, they are regulatory measures, not taxes.

## VI.

Because we have determined that the development fee ordinances in this case were not validly adopted, we must consider plaintiff New Jersey Builders Association's claim that it be refunded the fees paid by its members to Chester Town-

ship. We agree with the trial court and the Appellate Division that plaintiff lacks standing to assert that claim. Plaintiff is a trade organization and may not assert individual damage claims on behalf of its members. 232 *N.J.Super.* at 204, 556 *A.*2d 1236 (citing *Mill Race Ltd. v. Mayor, Township of Bernards,* 230 *N.J.Super.* 160, 166, 553 *A.*2d 44 (App.Div.1989)). Although plaintiff does have an interest in the validity *vel non* of the ordinances, it is not a party in interest in an action for refund of fees to its individual members. We affirm the Appellate Division's conclusion that the trial court acted properly in dismissing that claim without prejudice to the right of individual members to seek refunds in separate actions.

## VII.

We determine that under the FHA, as well as the zoning power of the MLUL and the police power, municipalities with the approval of COAH can impose reasonable fees on the development of commercial and non-inclusionary residential property as inclusionary-zoning measures to provide lower-income housing. Such development fees may be enacted by ordinance and, subject to the approval and certification of COAH, may be included as part of a municipality's housing element and fair-share obligation under the FHA. Because the FHA does not provide sufficient guidance, the effectuation of such authority appropriately requires the promulgation of rules by COAH that will provide the standards and guidelines for the imposition and use of such development fees. We are satisfied that regulatory measures for development fees to be used for affordable housing adopted pursuant to valid rules can address constitutional concerns relating to due process, equal protection, the taking of property, or invalid taxation. In view of the grounds for our decision in this case, contentions based on those concerns need not be further addressed. Because of the absence of enabling administrative regulations, we hold that the current development-fee ordinances were not validly adopted.

The judgment of the Appellate Division is affirmed in part and reversed in part.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.