NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1535-12T2
A-1537-12T2
A-1538-12T2
A-1731-12T2
A-1732-12T2

FAIR SHARE HOUSING CENTER,
INC.,

     Plaintiff-Appellant,

v.

THE ZONING BOARD OF THE
CITY OF HOBOKEN,

     Defendant-Respondent,

and

ADVANCE AT HOBOKEN, LLC,

     Defendant/Third-Party
     Plaintiff-Respondent,

v.

CITY OF HOBOKEN and THE
MAYOR AND COUNCIL OF THE
CITY OF HOBOKEN,

     Third-Party Defendants-
     Appellants.

_____

FAIR SHARE HOUSING CENTER,
INC.,

     Plaintiff-Appellant,

v.

> **APPROVED FOR PUBLICATION**
>
> **July 28, 2015**
>
> **APPELLATE DIVISION**

THE ZONING BOARD OF THE
CITY OF HOBOKEN,

     Defendant-Respondent,

and

1415 PARK AVENUE, LLC,

     Defendant/Third-Party
     Plaintiff-Respondent,

v.

CITY OF HOBOKEN and THE
MAYOR AND COUNCIL OF THE
CITY OF HOBOKEN,

     Third-Party Defendants-
     Appellants.

---

FAIR SHARE HOUSING CENTER,
INC.,

     Plaintiff-Appellant,

v.

THE ZONING BOARD OF THE
CITY OF HOBOKEN,

     Defendant-Respondent,

and

9TH MONROE, LLC,

     Defendant/Third-Party
     Plaintiff-Respondent,

v.

CITY OF HOBOKEN and THE

MAYOR AND COUNCIL OF THE
CITY OF HOBOKEN,

    Third-Party Defendants-
    Appellants.

_____

FAIR SHARE HOUSING CENTER,
INC.,

    Plaintiff-Appellant,

v.

THE ZONING BOARD OF THE
CITY OF HOBOKEN and
NEW JERSEY CASKET COMPANY, INC.,

    Defendants-Respondents.

_____

Argued December 3, 2014 - Decided July 28, 2015

Before Judges Fuentes, Ashrafi and Kennedy.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket Nos. L-3643-11, L-5052-11, L-733-12, and L-1978-12.

Kevin D. Walsh argued the cause for appellant Fair Share Housing Center.

Ronald D. Cucchiaro argued the cause for appellants City of Hoboken and Mayor and Council of the City of Hoboken (Weiner Lesniak, LLP, attorneys; Mr. Cucchiaro and Richard Brigliadoro, on the brief).

Jennifer Phillips Smith argued the cause for respondent Advance at Hoboken, LLC (Gibbons P.C., attorneys; Ms. Smith, on the brief).

Kevin J. Coakley argued the cause for respondents 1415 Park Avenue, LLC, 9th

Monroe, LLC, and New Jersey Casket Company, Inc., (Connell Foley, LLP, attorneys; Mr. Coakley, of counsel; Meghan B. Burke and Genevieve L. Horvath, on the brief).

Dennis M. Galvin argued the cause for respondent Zoning Board of the City of Hoboken (Galvin Law Firm, attorneys; Mr. Galvin, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

These are five consolidated appeals filed to determine the enforceability of an affordable housing ordinance adopted by the City of Hoboken. Plaintiff Fair Share Housing Center (Fair Share) filed three of the appeals against four developers: Advance at Hoboken, LLC (Advance) and 1415 Park Avenue, LLC (1415 Park) (both respondents in A-1535-12); 9th Monroe, LLC (9th Monroe) (A-1537-12); and New Jersey Casket Company, Inc. (NJ Casket) (A-1538-12). The City and the City's Mayor and Council (City appellants) filed the two additional appeals against Advance and 1415 Park (A-1731-12), and against 9th Monroe (A-1732-12).

Each of the four developers named as defendants in this case received significant relief from the City's zoning laws in the form of variances from the Zoning Board of Adjustment (Zoning Board), conditioned upon the developers' compliance with the City's affordable housing ordinance. The trial court held

the ordinance was "null, void, and unenforceable" because it violated statewide affordable housing policies. The court invalidated the zoning approval conditions imposed by the Zoning Board, relieved the developers from their obligation to comply with the ordinance's provisions, and enjoined the City from enforcing or imposing "any requirement against the parties to construct affordable housing units and/or collect any monetary contribution related to the affordable housing from the parties[.]" Ultimately, the court dismissed with prejudice Fair Share's complaints and denied its motion for reconsideration.

Since these appeals were filed and argued, our Supreme Court decided In re N.J.A.C. 5:96 & 5:97, 221 N.J. 1, 6 (2015), which effectively eliminated, "until further order," the requirement to exhaust administrative remedies under the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329.4, and directed trial courts to resolve municipalities' constitutional obligations under Mount Laurel.[1] Thus, to the extent the trial court's decision here depended upon the Council on Affordable Housing's (COAH) availability as an administrative forum or its obligation to perform the responsibilities imposed by the

[1] S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel (Mt. Laurel II), 92 N.J. 158 (1983); S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel (Mt. Laurel I), 67 N.J. 151, appeal dismissed and cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975).

Legislature through the FHA, those issues are now moot.

Notwithstanding the current state of affairs with respect to COAH, we are compelled to address the issues raised by Fair Share in order to dispel any doubt concerning the enforceability of the City's affordable housing ordinance. We now reverse the trial court's order invalidating the City's affordable housing ordinance decision. Consequently, we hold the trial court erred in invalidating the zoning approval conditions related to compliance with the ordinance's provisions as to all of the developers named as defendants by Fair Share and remand for the trial court to adjudicate the remaining legal issues raised by the parties.

The trial court misconstrued the FHA and the case law applying it. There is no provision in the FHA or regulations promulgated by COAH requiring municipalities to submit all ordinances that impact a municipality's affordable housing obligation to COAH for approval. The "substantive certification" provided by COAH to those municipalities seeking its protection from builder's remedy suits[2] is entirely

---

[2] As Judge Cuff explained in <u>In re Adoption of N.J.A.C. 5:94 & 5:95</u>, 390 <u>N.J. Super.</u> 1, 17 (App. Div.), <u>certif. denied</u>, 192 <u>N.J.</u> 71 (2007), a "builder's remedy" suit was a scheme devised by the Court in <u>Mt. Laurel II</u> "for the consistent and hopefully expeditious resolution of litigation." (Citation omitted).

voluntary.  N.J.S.A. 52:27D-313(a).  The Legislature enacted the FHA and established COAH "to oversee the development of low and moderate income housing throughout the state through a system of voluntary participation by municipalities in the COAH process." Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 513 (2002) (emphasis added).

In the interest of clarity, we also expressly reverse the trial court's decision invalidating the section in the ordinance that provides for voluntary payments by developers in lieu of compliance with the ordinance's affordable housing requirements. The trial court conflated development fees under N.J.A.C. 5:97-8.3, with the payments in lieu, created "as an option to the on-site construction of affordable housing otherwise required by ordinance," authorized by N.J.A.C. 5:97-8.4 and sanctioned by N.J.S.A. 27D:329.3.

Before we begin our analysis, we will briefly describe the procedural trek these cases took before they ended up before us in this consolidated appeal.

I

From July 7, 2011 to April 17, 2012, Fair Share filed four individual actions in lieu of prerogative writs seeking declaratory and injunctive relief against the Zoning Board and the following private developers: Advance, 1415 Park, 9th

Monroe, and NJ Casket. Fair Share sought compliance with the City's affordable housing ordinance in the form of a judicial declaration that any zoning approvals these developers received be deemed void or enjoined, unless each one filed a "plan of compliance" with the affordable housing ordinance.

All four developers named as defendants by Fair Share filed answers asserting a variety of affirmative defenses including challenges to Fair Share's standing to raise these issues, attacking the timeliness of the actions in lieu of prerogative writs pursuant to Rule 4:69-6, and challenging the validity, enforceability, and constitutionality of the affordable housing ordinance.

Three of the four developers also filed cross-claims against the Zoning Board and third-party complaints against the City and the Mayor and Council, asserting, inter alia, estoppel based on the City's failure to enforce the affordable housing ordinance and the Zoning Board's failure to condition prior approvals upon compliance with the affordable housing ordinance. Citing 42 U.S.C.A. § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, the developers also asserted violations of their constitutional right to due process, private property rights, and inverse condemnation. They all sought counsel fees under 42 U.S.C.A. § 1988 and N.J.S.A. 10:6-2(e).

The Zoning Board and City appellants all responded to the cross-claims and third-party actions.

### Common Core of Operative Facts

The record before us includes the minutes from three 1988 City Council meetings regarding the adoption of the City's affordable housing ordinance. Included as part of this record are minutes from a special session of the City Council held on May 4, 1988. The subject for discussion at this special meeting was denoted, "[t]o meet and discuss Hoboken's Affordable Housing with representatives from [COAH]." In attendance were the City's Law Director, CDA[3] Director, and Arthur Bernard on behalf of COAH. Two weeks later, at the meeting held on May 18, 1988, the City Council unanimously adopted the affordable housing ordinance. The Mayor signed the ordinance into law on May 19, 1988.

### The Ordinance

The ordinance titled, "An Ordinance Requiring the Provision of Affordable Housing Units and Providing for Voluntary Contributions in Lieu of Such Housing as a Part of New Construction and Substantial Rehabilitation of Existing Buildings in the City of Hoboken," contains five "Whereas" clauses setting forth the factual basis and public policy goals

---

[3] "CDA" stands for "Community Development Agency."

driving its passage:

     WHEREAS, the City of Hoboken has determined that an emergency exists in the city with respect to availability of affordable housing for household[s] of low and moderate income; and

     WHEREAS, the New Jersey Council on Affordable Housing has found that the City of Hoboken has a responsibility to provide additional low and moderate income housing, and whereas such obligation has been affirmed by the Supreme Court in [<u>S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel</u>], 92 <u>N.J.</u> 158 ("Mt. Laurel II"), and

     WHEREAS, the absence of federal housing subsidies renders it impossible for the City of Hoboken to provide affordable housing with available public resources commensurate with the need for such housing or the legal obligation of the City of Hoboken; and

     WHEREAS, the limited availability of vacant land in the City of Hoboken, coupled with the high cost of that land and the strength of the market demand for luxury housing, has resulted in a situation where the need for affordable housing cannot realistically be met through the efforts of private developers acting voluntarily to provide affordable housing through their own resources; and

     WHEREAS, the use of an inclusionary or mandatory set aside ordinance as a means of bringing about the production of affordable housing is not only urged in <u>Mt. Laurel II</u> and in the New Jersey Fair Housing Act, c.222, P.L. 1985, but has been demonstrated to be an effective means of producing affordable housing without placing unreasonable burdens on private developers.

NOW, THEREFORE, BE IT ORDAINED by the Mayor and City Council of the City of Hoboken, New Jersey, as follows . . . .

What "followed" is a comprehensive plan to encourage and bring about the development of affordable housing in Hoboken. In a case-specific context, the ordinance sets "General Standards" for the construction of new housing and the rehabilitation of existing stock, with mandatory set-asides based on the scope of the projects. It includes a provision requiring affordable units in a particular development where it is "especially suited for senior citizen housing by virtue of physical character and location." It also provides developers with the option of making a "voluntary cash contribution to the Trust Fund created by this Ordinance, or a voluntary contribution of land and improvements to the City of Hoboken in lieu of constructing all or part of the affordable housing units required by this Ordinance." The ordinance is codified under Article XVII of the City Code, §§ 196-68 to -81.

As it relates to this case, the key provisions of the ordinance are:

> A. All development of residential property in the City of Hoboken, taking place either through the construction of new structures on vacant land or through the substantial rehabilitation of existing structures except as herein provided below, shall include low and moderate income housing in the proportions specified below and consistent

with the standards and conditions of this Article.

. . . .

C. Each development subject to this Article shall contain the following percentage of units to be provided for affordable housing.

(1) Where all affordable units provided pursuant to this Article are located on site, ten percent (10%) of the total number of units.

. . . .

(4) Pursuant to § 196-73 below, the city may enter into an agreement with a developer to allow the developer to make a voluntary cash contribution in lieu of providing the affordable units required by this subsection.

[Hoboken, N.J., Code § 196-69(A), (C) (1988).]

For each development subject to the ordinance, the developer is required to provide a plan of compliance with certain described features, and no preliminary site plan approval (or if none is needed, then no construction permit) shall be granted unless and until the compliance plan has been approved by the City's planning board. § 196-69(D)(1)-(2). Any development plan that is artificially subdivided to evade the ordinance's provisions shall be disapproved. § 196-69(D)(4)-(5). There are criteria for the board to permit affordable housing units to be provided off site, § 196-71, or for the

developer to make a payment in lieu of constructing affordable housing, § 196-73.

The payment in lieu provision includes the following:

A. Projects subject to the provisions of this Article may elect, with the approval of the Board, to make a voluntary cash contribution to the trust fund created by this Article or a voluntary contribution of land and improvements to the City of Hoboken in lieu of constructing all or part of the affordable housing units required by this Article.

B. The Board is authorized to approve a voluntary cash contribution under this section only upon written findings, supported by the record, that such a contribution will further the housing policies of the City of Hoboken more than the construction of affordable units at the time in question. In making such findings, the Board shall consider and report on the following factors:

(1) The number of units that can be built or low/moderate income households preserved with the cash contribution vs. the number of new units required to be built.

(2) The availability and stage of readiness of affordable housing projects on which the trust funds can be expended.

(3) The reasons which make the provision of actual units impractical.

C. The opportunity to make a voluntary cash contribution in lieu of providing affordable housing is not intended to be and should not be construed as a right available to developers at their sole option. The policy of this Article favors provision of actual affordable units.

13

[§ 196-73.]

This provision describes, in great detail, the calculations for the amount of contribution permitted. § 196-73(D).

The section captioned, "Construal of contribution provisions," reads as follows:

> The provisions of this Article regarding contributions in lieu of providing affordable housing units are to be construed an alternative that may be voluntarily chosen by developers, which alternative has not generally been offered in inclusionary ordinances adopted by other municipalities and which is not required by any statutory provision, administrative regulation or court decision to be offered by the City of Hoboken and, therefore, rather than imposing a burden on developers, has the effect of mitigating any potential economic costs on developers created by the imposition of the inclusionary affordable housing requirements of this Article.

[§ 196-78.]

Finally, there is a severability clause intended to insulate the legally viable sections of the ordinance from any taint created by a provision a court may find unenforceable: "If any provision of this Ordinance is declared invalid, such invalidity shall no [sic] affect any other provision of this Ordinance which can be given effect, and to this end the provisions of this Ordinance are declared to be severable."

The Hoboken Master Plan

Part of the record Advance submitted to the trial court is

a copy of the housing element from the City's April 2004 Master Plan, which contained overview information about the City's housing stock and affordable housing needs. It describes the City as "a mature urban community with a diverse residential population with respect to race, income level and age, and in the housing opportunities it provides for its residents." According to the 2004 master plan, the City's "wide array of housing types rang[ed] from public housing projects to million-dollar condominiums" and included "some one- and two-family homes, most of which [were] constructed as row-houses, apartments above stores, and numerous low-rise, mid-rise, and high-rise residential buildings."

The plan showed a number of differences between the City's housing characteristics and the rest of Hudson County. Census figures compiled from 1990 to 2000 show the City experienced a higher percentage in growth in the number of housing units than did Hudson County, fourteen percent as compared to five percent. The City's median dwelling unit value was nearly three times the county-wide median value, and the City's median contract rent was more than forty percent higher than the county-wide level, "indicating the expensive housing stock value in [the City]." The City's rents were also significantly higher than the rent paid by the rest of the residents of Hudson County. The median

gross rent in the City in 2000 was $1002, compared to $703 for Hudson County.  However, in Hoboken, the median rent increased from $511 in 1990 to $1002 in 2000.  The master plan noted this was "a jump of just under 50 percent when adjusted for inflation."

The City had a development moratorium from 1992 to 1997, due to a lack of sewer capacity.  A construction boom followed after the regionalization of sewer services via the North Hudson Sewerage Authority.[4]  Nearly all new residential construction that followed involved multi-family units.  The master plan's authors considered it "unlikely that new affordable housing will be constructed without government action or other intervention in the real estate market.  In fact, some existing affordable units may lose their affordability controls when their restrictions mandating below-market rents expire."

---

[4] The North Hudson Sewerage Authority was established in 1988 as part of a Consent Order in a regulatory enforcement action brought by the United States Environmental Protection Agency (EPA), compelling local communities to relinquish control of their sewer service.  The Authority services the sewerage disposal needs of the residents of Hoboken, Union City, Weehawken, and West New York.  The EPA and the New Jersey Department of Environmental Protection lifted a ten-year ban on sewer connections in these four municipalities in 1994.  This sparked the reclamation and development of the Hudson River waterfront in Hoboken and Weehawken.  N. Hudson Sewerage Auth., Authority History, N. Hudson Sewerage Auth., http://www.nhudsonsa.com/About/history.html (last visited July 13, 2015).

Between 1990 and 2000, the City's population increased sixteen percent, from 33,397 to 38,577 residents. Just above half of the City's population was in the twenty-five to forty-four-year-old age bracket; growth in that age group increased 36.8 percent from 1990 to 2000. The largest population group decline over that time period was in children aged five to seventeen, decreasing by 29.9 percent. The City's median age in 2000 was 30.4 years old, far below the statewide average of thirty-seven.

The residents of Hoboken also enjoyed a higher standard of living than the rest of Hudson County. As reported in the 2000 census, over 75 percent of Hoboken's residents over the age of fifteen were "in the labor force[.]" Nearly two-thirds of the City's residents had managerial or professional occupations during this same time period. However, although Hoboken's median household income was $62,550, there was a wide range of annual income levels; 43 percent of households earned more than $75,000, while about 22 percent earned less than $25,000.

The 2004 Master Plan listed approximately 5000 affordable housing units in the City. These affordable housing units were established under various programs; approximately 1000 of these units were restricted to senior citizens or residents with disabilities. The Master Plan also included this cautionary

17

note: "It is difficult to determine exactly how many units in the City have controls on rents that classify them as affordable. . . . It is noted that the affordability controls governing these units are at varying stages of their lifespans, and some are set to expire."

The plan concluded with fifteen recommendations to protect and increase the City's existing affordable housing stock. The plan recommended updating and enforcing the existing affordable housing regulations in the Zoning Ordinance, and providing additional affordable housing units in new residential developments. Of particular relevance here, the plan specifically noted: "the City currently requires the provision of affordable units, or payment in lieu of creation, for most residential new construction or substantial rehabilitation. These regulations should be enforced, particularly for larger developments." The plan suggested that the City's regulations "should be reviewed for compliance with COAH's Substantive Regulations and other applicable requirements." Fair Share included in the appellate record the third round housing element and fair share plan document adopted by the Hoboken Planning Board on December 19, 2005. With some variations, this document showed statistics similar to those described in the City's 2004 Master Plan.

## COAH's Jurisdiction

On December 30, 2008, the City submitted to COAH a petition for third round substantive certification and a draft housing element and fair share plan. The cover letter explained these documents remained in draft form because "[t]he City's finances have been taken over by the State[.]" This further delayed bringing the matter to a hearing for final adoption. Those matters were expected to be finalized "early in 2009."

On February 3, 2009, COAH's then-Executive Director Lucy Vandenberg informed the City's Mayor that the submission "[did] not meet the criteria for a petition." Thus, "[b]ecause Hoboken City did not submit a petition for third round substantive certification by December 31, 2008, it is no longer under the jurisdiction of COAH." Despite this, Vandenberg made clear the City was "still required to impose non-residential development fees pursuant to . . . [N.J.S.A. 40:55D-8.1 through -8.7]." According to Vandenberg, developers were required to deposit those fees into the statewide New Jersey Affordable Housing Trust Fund, rather than the City's affordable housing trust fund. Vandenberg concluded the letter by encouraging the City "to once again participate in the COAH process" which could provide protection from builder's remedy litigation and permit the City to retain development fees locally.

A-1535-12T2

On April 12, 2011, responding to correspondence from an attorney representing a developer who is not a party in this appeal, COAH's Acting Executive Director Sean Thompson confirmed that Hoboken was "not currently under COAH's jurisdiction." Thompson specified two requirements the City was still bound to fulfill: (1) the imposition of non-residential development fees pursuant to N.J.S.A. 40:55D-8.1 to -8.7, to be deposited in the statewide New Jersey Affordable Housing Trust Fund, and (2) continue to provide monitoring and oversight of monies transferred to the City pursuant to certain specified regional contribution agreements.[5] We note Thompson did not address or opine regarding the City's negotiations on a redevelopment plan through which it sought to impose a twenty percent affordable housing set-aside obligation. The record includes correspondence from the attorneys representing the developers in this case and the Acting Executive Director of COAH as well as

---

[5] Both of these requirements are now moot. The Legislature amended the FHA and abolished "regional contributions agreements" effective July 17, 2008. N.J.S.A. 52:27D-312. Following the Supreme Court's decision in In re N.J.A.C. 5:96 & 5:97, supra, 221 N.J. at 6, this court in In re Failure Of The Council On Affordable Hous. To Adopt Trust Fund Commitment Regulations, 440 N.J. Super. 220, 227-28 (App. Div. 2015), enjoined "COAH or any other part of the executive branch from engaging in any further attempt to seize affordable housing trust funds" under N.J.S.A. 52:27D-329.2. We further directed that "[t]he use and disposition of those funds will hereafter be decided, in the first instance, by Mount Laurel-designated trial judges." Id. at 228.

affidavits from other interested parties. We have opted not to describe these exhibits at length because they are not relevant to our legal determinations.

Advance

Advance owned property at 1316-1330 Willow Avenue. In 2006, the City's Zoning Board granted the property's prior owner preliminary site plan approval and bulk variance relief to construct a mixed-use development project that included 104 residential units, 7500 square feet of retail space, and 126 parking spaces. Advance sought and received a total of eight variances: maximum lot coverage from 60 percent to 97 percent; minimum rear yard from 30 feet to 0 feet; maximum permitted distance from front property line to rear wall from 70 feet to 195 feet; number of building stories above one level of parking from three to four, and a partial fifth story above two levels of parking; maximum building height from 40 feet to about 68 feet for the main level, with a penthouse and tower at 80 and 100 feet, respectively; residential density from 54 units to 104 units; increased amount permitted of non-masonry façade material; and increased maximum customer service area from 1000 square feet to 7500 square feet.

The 2006 Zoning Board resolution did not mention affordable housing. Condition 3 noted the application "must comply with

the necessary requirements" of the City's zoning ordinance and the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163. Condition 4 further stated:

> The Applicant shall develop, prepare and improve the subject premises so as to conform with all of the details shown on the aforementioned plans and submissions, as presented to the Board and in accordance with the zoning ordinances, building codes and all other standards and ordinances unless expressly stated to the contrary within the approvals granted.

This approved project was never built. In January 2010, after Advance became the contract purchaser, the Zoning Board granted Advance an amended preliminary site plan approval, conditional use approval, and further variance relief. The Zoning Board granted Advance the following additional variance relief: increase the number of building stories from four to seven, plus a penthouse; increase the maximum building height from 40 feet to 84 feet for the main level, with a penthouse and tower at 91 feet and 9 inches, and 98 feet and 9 inches, respectively; increase the maximum retail area from 1000 square feet to 21,725 square feet; allow retail use on a block front which does not presently include two other retail uses; increase rooftop coverage for appurtenances from 10 percent to 19 percent; decrease minimum Willow Street setback from 5 feet to 0 feet; eliminate front yard fencing requirement; increase

residential density from 61 units to 140 units; and allow various parking garage rule changes.

The approval resolution described significant efforts Advance was expected to undertake to clean up the prior owners' environmental contamination on the site. This resolution again did not directly mention affordable housing as a condition of approval. Condition 9 stated the applicant "must comply with the necessary requirements" of the City's zoning ordinance and the MLUL.

Condition number 8 of the resolution also stated:

> The application for Final Site Plan Approval shall conform with all of the details shown on the aforementioned Preliminary Site Plan Approval "Resolution Drawing Set" and submissions, as presented to the Board or as amended as required to comply with the conditions of this resolution and in accordance with the zoning ordinances, building codes and all other standards and ordinances unless expressly stated to the contrary within the approvals granted.

In January 2011, the Zoning Board granted Advance what it characterized as a "de minimus change" regarding the widening of the sidewalk as "dictated" by the County Planning Board. This resolution again failed to include any reference to the City's affordable housing ordinance.

In April 2011, the Zoning Board reviewed and approved Advance's Amended Preliminary and Final Site Plan Approval to

address egress and ingress to the parking garage and changes to the loading dock facilities. The record includes the following colloquy between a Hoboken resident and Robert Bloch, Advance's architect, which occurred when the application was open for public comment:

> RESIDENT: I just have one question. Are the plans that you presented tonight in accordance with the affordable housing ordinance [of] the City of Hoboken?
>
> ARCHITECT: Yes, they will be.
>
> RESIDENT: Meaning what?
>
> ARCHITECT: Well, I would say I am not completely familiar with that document.
>
> RESIDENT: Well, then, how could you tell me it is in conformance? You are saying they intend to do that?
>
> ARCHITECT: Maybe [Advance's attorney] could answer.
>
> ADVANCE'S ATTORNEY: I think the Board is going to impose a condition on the approval relating to affordable housing[.]

The Resolution of Approval adopted by the Zoning Board on May 17, 2011, describes in detail the evidence presented in support of the application and the variances requested, mentions the various revisions made to the original application, and lists the developer's witnesses who testified before the Board and their particular area of expertise. The resolution also specifically mentions the exchange between the "resident" and

Advance's architect and its attorney, as quoted above, and notes, "[the Resident][6] was informed that <u>the Board will impose a condition on the approval relating to the applicant's affordable housing obligation</u>." (Emphasis added). As further evidence that approval of the application was expressly conditioned on Advance's compliance with the City's affordable housing ordinance, the May 17, 2011 Approval Resolution also includes the following provision:

> The applicant shall be responsible for obtaining any other approvals or permits from other governmental agencies, as may be required by law, including but not limited to <u>the Municipality's</u> and State's <u>affordable housing regulations</u>; and the applicant shall comply with any requirements or conditions of such approvals or permits.
>
> [(Emphasis added).]

Advance has never requested any relief from this obligation. The record also does not contain a statement by the Zoning Board regarding how it expected Advance to comply with the affordable housing ordinance. See Hoboken, N.J., Code § 196-69D (requiring each development to submit to the Planning Board a plan of compliance with the terms and conditions of the ordinance).

---

[6] The Approval Resolution includes the name and address of the "resident." We have opted not to include this information in the opinion to protect the person's privacy.

1415 Park owned property at 1415 Park Avenue in Hoboken. In February 2007, the Zoning Board granted preliminary site plan approval and variance relief for 1415 Park to demolish an existing parking garage and construct a twelve-story mixed-use development project that included 180 residential units, 30,000 square feet of retail space, 46,055 square feet for an elementary charter school, and 371 parking spaces. The second application submitted in 2011 is the one challenged by Fair Share in this appeal. In this second application, 1415 Park sought to construct a twelve-story residential building that would accommodate 212 apartments, retail space, a significantly smaller school (reducing its proposed school facility from 46,055 square feet in 2007 to 30,000 square feet in 2011), and thirty more parking spaces, resulting in a total of 401 parking spaces.

The transcription reflecting verbatim the discussions of the members of the Zoning Board during the June 28, 2011 meeting approving the 1415 Park application indicates the Board's preoccupation with including in the resolution the "standard language pertaining to the [C]ity's affordable housing ordinance." The following colloquy also makes clear that the Board expected that mandate to be carried out as a "percentage"

of the dwelling units:

> BOARD CHAIRMAN: We're doing that.
>
> BOARD MEMBER: What's the percentage, sir? I forgot.
>
> BOARD COUNSEL: I don't have it in front of me right this second, I apologize.
>
> BOARD MEMBER: Are we doing that on every application?
>
> BOARD COUNSEL: This Board is doing it.
>
> BOARD CHAIRMAN: Just in case, just in case.
>
> BOARD MEMBER: Thank you. That's a biggie.
>
> BOARD COUNSEL: We always have certain standardized conditions and that's one of them[.]

Condition number 3 of the resolution also stated:

> The Applicant shall develop, prepare and improve the subject premises so as to conform with all of the details shown on the aforementioned plans and submissions, as presented to the Board and in accordance with the zoning ordinances, building codes and all other standards and ordinances unless expressly stated to the contrary within the approvals granted.

Several variances were granted: increasing maximum lot coverage from 65 percent to 81 percent; increasing number of building stories from eight to twelve; increasing maximum building height from 80 feet to 138 feet; decreasing minimum front yard and rear yard setbacks from 10 feet and 20 feet, respectively, to 0 feet in both yards; increasing maximum

27

permitted signage from 200 square feet to 345 square feet; and allowing parking variances for a "robotic" parking garage that did not use parking "spaces" or aisles.

The resolution states, in granting the approval:

> 4. The applicant shall be responsible for obtaining any other approvals or permits from other governmental agencies, as may be required by law, including but not limited to the Municipality's and State's affordable housing regulations; and the applicant shall comply with any requirements or conditions of such approvals or permits.
>
> 5. The applicant must comply with the Development Fee Ordinance of the City of Hoboken, if applicable, which Ordinance is intended to generate revenue to facilitate the provision of affordable housing.

Nothing in the record before us indicates 1415 Park ever objected to or opposed any of these conditions at the time of the approval.

### 9th Monroe

9th Monroe owns property at 900 Monroe Street in Hoboken which consists of several lots as determined by the municipal tax assessor. In June 2007, under a prior owner (900 Monroe Development, LLC), the City's Zoning Board granted final site plan approval (preliminary site plan approval having been granted in October 2005) and variance relief for construction on this site, which previously had industrial uses. As amended in the final approval, the site was approved for construction of a

mixed-use development project that included 112 residential units, 7608 square feet of retail space, 10 townhouses, and 151 parking spaces. 9th Monroe received variances regarding the following: permitted use; maximum number of stories; minimum lot width; maximum lot coverage; and minimum side yard. The approval resolution did not mention affordable housing, but stated, as condition 3, that the application "must comply with the necessary requirements" of the City's zoning ordinances and of the MLUL.

Condition number 4 of the resolution also stated:

> The Applicant shall develop, prepare and improve the subject premises so as to conform with all of the details shown on the aforementioned plans and submissions, as presented to the Board and in accordance with the zoning ordinances, building codes and all other standards and ordinances unless expressly stated to the contrary within the approvals granted.

This approved project was never built. As the new owner of 900 Monroe Street, 9th Monroe applied in 2011 to amend the 2007 approvals. The Zoning Board approved 9th Monroe's amended preliminary site plan, which included the following variance relief: a use variance to allow residential uses; an increase of maximum building height from 80 feet to 126.5 feet, and eleven stories where the zoning ordinance permitted a maximum of four stories; residential density of 135 units, beyond the previously

approved 112 units; an automated garage of 188 spaces, with ten at grade; and a decrease of the minimum amount of masonry façade material from 75 percent to 34 percent.

The approval resolution conditions included the following:

> 4.    The applicant shall be responsible for obtaining any other approvals or permits from other governmental agencies, as may be required by law, including but not limited to the Municipality's and State's affordable housing regulations; and the applicant shall comply with any requirements or conditions of such approvals or permits.
>
> 5.    The applicant must comply with the Development Fee Ordinance of the City of Hoboken, if applicable, which Ordinance is intended to generate revenue to facilitate the provision of affordable housing.

Nothing in the record before us indicates 9th Monroe objected to or opposed any of these conditions at the time of the approval.

## NJ Casket

NJ Casket owns property at 1400-1404 Clinton Street in Hoboken.  The property covers several lots as determined by the municipal tax assessor.  In August 2007, the City's Zoning Board granted preliminary site plan approval and variance relief for construction of a "mixed-use live-work loft building" on this site.  As noted in the approval resolution, NJ Casket received the following variances: allowing residential uses in a district zoned for manufacturing and office uses; increasing maximum lot coverage from 65 percent to 100 percent on the ground floor and

76 percent on the higher floors; increasing the number of building stories from four to six; and decreasing minimum front yard, side yard, and rear yard setbacks from 10 feet, 10 feet, and 20 feet, respectively, to 0 feet in all three yards. The approval resolution did not mention the affordable housing ordinance. Condition 2 included a generalized statement requiring the applicant to "comply with the necessary requirements" of the City's zoning ordinances and of the MLUL.

The original 2007 proposal was for a seven-story building with a mix of "live/work studios" and traditional residential units, in an area zoned for manufacturing and office uses. The studio/regular unit mix was initially proposed as 10/54, but was changed to 20/30 in the original preliminary site plan approval. In August 2010, NJ Casket sought and obtained approval to change the ratio again, to 10/49. That approval also noted some additional variances requested and approved, including for twenty-five percent roof coverage, where the zoned maximum was ten percent. In that approval resolution, adopted in January 2011, the Zoning Board included among the terms and conditions the following:

> 4. The applicant shall be responsible for the obtaining of any other approvals or permits from other governmental agencies, as may be required by law, and the applicant shall comply with any requirements or conditions of such approvals or permits.

5. The applicant shall be responsible for the obtaining of any other approvals or permits from other governmental agencies, as may be required by law, and the applicant shall comply with any requirements or conditions of such approvals or permits, including compliance with COAH regulations.

6. An essential and non-severable condition of this approval is compliance with the Development Fee Ordinance of the City of Hoboken, if applicable, which Ordinance is intended to generate revenue to facilitate the provision of affordable housing.

NJ Casket received final site plan approval in early 2012, without any significant changes to its plans. The approval resolution included the following conditions:

4. The applicant shall be responsible for obtaining any other approvals or permits from other governmental agencies, as may be required by law, including but not limited to the Municipality's and State's affordable housing regulations; and the applicant shall comply with any requirements or conditions of such approvals or permits[.]

5. The applicant must comply with the Development Fee Ordinance of the City of Hoboken, if applicable, which Ordinance is intended to generate revenue to facilitate the provision of affordable housing.

Consistent with the way the other developers behaved, the record before us does not indicate NJ Casket objected to or opposed any of these conditions at the time of the approval.

II

On November 9, 2012, the trial court issued a final

judgment in this consolidated matter confirming earlier rulings it had issued on June 1, 2012. The court found Hoboken's Affordable Housing Ordinance, codified as § 196-68 to -81, "is inconsistent with the Municipal Land Use Law, the Fair Housing Act, and the procedures and guidelines that have been promulgated by the Council on Affordable Housing[.]" The court "declared" the ordinance "null, void, and unenforceable as a matter of law[.]" The court enjoined the City from enforcing "any requirement" on the developers to construct affordable housing units and/or collect from these developers "any monetary contribution" related to the affordable housing.

Without citing to any specific statute, the trial judge reached the following conclusion:

> [I]t is the [c]ourt's view that the Legislature's intent was not that COAH review ordinances or review municipalities one time and leave it alone. COAH is intended, the [c]ourt's view, to be a vehicle that is permanent, fluid, consistent and regular. In that, the [c]ourt takes the position that COAH is vested with the authority not only to review the existing ordinances at the time that Mount Laurel became effective but, also, to continue the review. In other words, they would be able to determine whether there was a need to alter, modify, increase or decrease a municipality's fair share responsibilities which necessarily would require their involvement through the entire process at some point.

The trial court found support for this expansive oversight

role for COAH in Holmdel Builders Ass'n v. Holmdel, 121 N.J. 550 (1990).  Without citing to any specific language or analysis in Holmdel or discussing the facts of that case, the trial court concluded the Supreme Court in Holmdel "held that every municipality with an affordable housing obligation must submit to COAH for approval of its plan to meet that need."

Fair Share and the City both argue the trial court erred in holding all municipal affordable housing ordinances require review by COAH, whether or not the municipality is under COAH jurisdiction seeking substantive certification.  They maintain the trial court failed to appreciate the voluntary nature of COAH's jurisdiction, and the alternative route the FHA provides to municipalities under N.J.S.A. 52:27D-313(a).

1415 Park, 9th Monroe, and NJ Casket collectively argue COAH's involvement was required in all matters affecting affordable housing and satisfaction of obligations under the Mount Laurel doctrine.  According to these developers, the FHA was intended to preempt the field, thus rendering the City's inconsistent affordable housing ordinance invalid.

We are satisfied the trial court misconstrued the purpose and role the Legislature intended COAH to play in assisting municipalities in fulfilling their constitutional obligation to provide a realistic opportunity for the construction of their

34

fair share of the present and prospective regional need for low and moderate income housing. See Mt. Laurel I, supra, 67 N.J. at 174. The substantive certification process available to municipalities under N.J.S.A. 52:27D-313(a) is entirely voluntary. Toll Bros., Inc., supra, 173 N.J. at 513, 545. As Justice LaVecchia explained:

> The FHA created the Council on Affordable Housing (COAH), which was designed to provide an optional administrative alternative to litigating constitutional compliance through civil exclusionary zoning actions. Under the FHA, towns are free to remain in the judicial forum should they prefer it as the means to resolve any disputes over their constitutional obligations.
>
> [In re N.J.A.C. 5:96 & 5:97, supra, 221 N.J. at 4.]

There are no provisions in the FHA or regulations promulgated by COAH that required Hoboken in 1988 to submit its affordable housing ordinance for approval by COAH. This question is so firmly settled that it requires no further elaboration. See In re Adoption of N.J.A.C. 5:94 & 5:95, supra, 390 N.J. Super. at 6-9.

III

What is not settled, however, is whether the "payment in lieu" provisions in Hoboken's affordable housing ordinance needed COAH's approval under the Court's decision in Holmdel.

Analysis of this issue requires a brief recitation of the legal landscape prior to and after the Holmdel decision. Before the Court issued its decision in Holmdel, COAH had proposed and adopted some relevant regulations. These amendments to COAH's first-round rules were proposed in April 1988, adopted in June 1988, and codified at N.J.A.C. 5:92-8.4 under the heading "Developer Agreements." 20 N.J.R. 865 (Apr. 18, 1988); 20 N.J.R. 1689 (July 18, 1988).

In its proposal, COAH noted its prior rules provided that inclusionary developments should presumptively contain a twenty percent set-aside of affordable housing units, at a gross density of six units per acre. This was intended to "provide a reasonable balance necessary to insure that the project is realistic and will actually be constructed." 20 N.J.R. 865. After it received several plans that deviated from those requirements, COAH found it necessary to develop standards regarding its consideration of such deviations. Ibid. COAH analyzed developer agreements throughout the state, and determined deviations from the presumptive requirements should be permitted if the three following conditions were met: "1. That the agreement continues to provide the requisite realistic opportunity [for affordable housing]; 2. That the agreement not unduly burden the market units; and 3. That the developer must

have the experience and financial ability to perform its obligations. The burden is on the municipality proposing the agreement." Ibid.

The result of this process was the adoption of N.J.A.C. 5:92-8.4(d), through which COAH codified those three conditions and additionally provided increased densities and incentives for developers to build the affordable housing:

> (e) All agreements where the market units are single family detached dwellings may provide that, in exchange for an increase over existing density, the developer either: construct low and moderate income units as part of an inclusionary development; or pay a voluntary fee to be utilized by the municipality for an RCA [regional contribution agreement] or municipally constructed low and moderate income housing. The developer's expense in either case must bear a reasonable relationship to the increase in density, such that the agreement does not violate the test in (d)1.-3. above.
>
> (f) Agreements where the market units are multi-family dwellings may permit deviations from the presumptive requirements of a 20 percent set-aside:
>
> 1. Where there is also an increase over existing density. For example, in cases where the allowable density exceeds the presumptive minimum density requirement (for example, 10 to 16 units per acre on a multi-family development) it may be reasonable to have a set-aside higher than 20 percent.
>
> 2. Where the developer builds a higher proportion of moderate to low income units; or

37

3. Where the agreement contains a comparable incentive.

4. Absent such incentives, a deviation from the presumptive requirement is not permitted. For example, an ordinance which requires a set-aside higher than 20 percent or a 20 percent set-aside plus additional fees, and which permits only the minimum six units per acre and an equal split of low to moderate income units without any additional bonus densities or without other significant cost reductions or other incentives to the developer would not meet the test of (d) above since it results in a significant reduction of the realistic opportunity.

5. No agreement may provide for a voluntary developer fee without also providing for a comparable off-setting incentive.

[20 N.J.R. 1689-90.][7]

These regulatory changes occurred before the City adopted its affordable housing ordinance in May 1988. A representative from COAH met with the City Council at a special meeting prior to the unanimous adoption of the City's affordable housing ordinance. COAH made more regulatory changes in December 1990 in response to the Court's Holmdel decision.

Holmdel arose from "attempts by several municipalities to comply with their obligation to provide a realistic opportunity

---

[7] These regulations were adopted as proposed. See 20 N.J.R. 865. They generated only a few comments. 20 N.J.R. 1689. In response, COAH emphasized the need for appropriate incentives to developers to create a regulatory environment that provided a realistic opportunity for the housing to actually be built. Ibid.

for the construction of affordable housing under [the] ruling in Mt. Laurel II and the provisions of the FHA." Holmdel supra, 121 N.J. at 556. After reviewing the history of the FHA and COAH's then evolving regulatory role and identity, the Supreme Court concluded,

> agency rulemaking is reasonably required in order to fulfill the legislative purpose of the FHA with respect to inclusionary-zoning measures. We further conclude that COAH's exercise of its rulemaking authority in the area of inclusionary zoning is incomplete because COAH has not yet specifically addressed mandatory development fees as available inclusionary zoning devices.
>
> [Id. at 578 (emphasis added).]

As a result, "the development-fee ordinances were subject to review and certification by COAH as a constituent part of the housing-element plan of the respective municipalities." Id. at 579. The Court determined "that COAH, through its rulemaking procedures, should specify standards for development fees, so that municipalities may consider employing such fees as inclusionary-zoning devices in designing their housing elements under the FHA." Ibid.

After discussing and rejecting various constitutional challenges, id. at 581-84, the Court emphasized the clear "similarities between mandatory set-asides and the development-fee ordinances." Id. at 584. Harking back to Mt. Laurel II,

supra, 92 N.J. 158, the Holmdel Court reminded the litigants that "mandatory set-asides as a form of inclusionary zoning were not analogous to a tax. We viewed them as legitimate regulatory measures suitably addressed to the broad goals of zoning. Development fees, to reiterate, perform an identical function." Ibid. Thus, the Court in Holmdel affirmed in part and reversed in part, holding: "Because of the absence of enabling administrative regulations, we hold that the current development-fee ordinances were not validly adopted." Id. at 586.

Three months later, in March 1991, COAH published in the New Jersey Register a notice of pre-proposal for Mandatory Developer Fee Regulations, citing COAH's intent to adopt rules to implement the Holmdel decision. 23 N.J.R. 646 (Mar. 4, 1991). COAH characterized Holmdel as having held that municipalities were authorized under the FHA, MLUL, and the police power "to establish mandatory developers' fees on commercial and non-inclusionary residential property to fund low and moderate income housing but that municipalities could not exercise that authority until COAH adopted rules establishing the circumstances under which such fees may be permissibly collected and spent." Ibid. To establish such rules, COAH wrote that it had formed a Task Force and was soliciting

40                                                      A-1535-12T2

comments from interested parties on the following issues:

> the overall wisdom of mandatory developers' fees in the overall context of the State's affordable housing policy; the type of developments that should be subject to fees; the amount of the fees imposed and the nature of its assessment; the relationship of fees to other inclusionary-zoning measures such as mandatory set-asides and density bonuses, the conditions for the creation and administration of affordable housing trust funds; the requirements for the use and application of such funds, whether a system of development fees should include counterbalancing density bonuses; and any other relevant concerns.

> [Id. at 646-47.]

COAH also issued an order authorizing municipalities to retain previously collected fees pending its rules promulgation, adding that the anticipated rules "will address the appropriate disposition of any fees collected prior to the Supreme Court's Holmdel decision." Id. at 647.

COAH proposed its new rules in September 1991. COAH determined that, as a general rule, a municipality wishing to collect development fees would need to undertake the otherwise optional step of petitioning COAH for substantive certification. 23 N.J.R. 2813 (Sept. 16, 1991). COAH would review the fee collection proposal as part of its comprehensive review of substantive certification. Ibid. Several circumstances would require exceptions to that rule, including these: where

municipalities already had received substantive certification or the court-issued alternative judgment of repose; where exclusionary zoning cases were in litigation; or where fees already had been collected. Ibid.

COAH set forth another exception relating to "urban aid municipalities," which expressly included Hoboken. See 18 N.J.R. 1547 (August 4, 1986); 26 N.J.R. 2352 (June 6, 1994) (listing urban aid municipalities including the City in first and second round rule adoptions). As to these municipalities, COAH explained:

> Urban aid municipalities present a special case. These municipalities have historically accepted a disproportionate share of New Jersey's poor and, as a result, many have exceedingly high fair share obligations. Therefore, it would be very difficult for these cities, as a class, to address their entire obligation in a six year period.
>
> The Legislature has recognized the effort of urban aid cities in Section 302 and 320 of the Fair Housing Act. The Council has recognized the role urban aid municipalities have accepted in its methodology. Urban aid municipalities have not been assigned reallocated present need or prospective need. Therefore, the Council will allow these municipalities to collect fees outside of the substantive certification process.
>
> [23 N.J.R. 2814 (emphasis added).]

Substantively, the proposed rule described both how fees

could be collected and how COAH would analyze whether municipalities could retain fees that had been paid prior to the rule's adoption. On the latter issue, COAH wrote:

> The Council has determined that it is vital for purposes of implementing the Fair Housing Act for municipalities to have the opportunity to retain development fees collected prior to December 13, 1990. <u>Millions of dollars were collected as a result of ordinances regulating development during years of substantial real estate activity. These residential and commercial projects</u> were not directly related to the satisfaction of a municipality's fair share obligation, yet they <u>consumed the one irreplaceable resource for satisfying the town's obligation</u> under the Fair Housing Act.
>
> [<u>Ibid.</u> (emphasis added).]

COAH further highlighted that development approvals had been conditioned on payment of the fees, so now the development sites were no longer available to satisfy the affordable housing obligation. "Therefore, a resource that could have been used for low and moderate income housing will have been dissipated, unless municipalities can retain development fees." <u>Ibid.</u> It was thus equitable to allow the municipalities to retain the fees. <u>Ibid.</u>

COAH explained further that it had studied available municipal ordinances in New Jersey and throughout the nation to craft fee maximums, based on a percentage of equalized assessed

valuation that would not be confiscatory. Ibid. COAH's rules would allow higher fees if a compensatory benefit, such as a density bonus, was allowed, or under a negotiated agreement with the developer. Ibid. With this approach, COAH deleted as no longer necessary its prior rule regulating voluntary agreements, N.J.A.C. 5:92-8.4(d) through (g). Ibid.

As part of this 1991 rule proposal, in the sections setting forth the "Basic requirements" and "Urban aid municipalities" rules, municipalities were prohibited from collecting or spending funds without COAH's approval. Id. at 2816 (setting forth the proposed rules N.J.A.C. 5:92-18.2 and -18.3).

As to the maximum fees that would be allowable under the rules without granting additional density bonuses, the proposed N.J.A.C. 5:92-18.10 allowed municipalities to collect one-half of one percent of the equalized assessed value for residential development, and proposed N.J.A.C. 5:92-18.11 allowed one percent of the equalized assessed value for non-residential developments. Id. at 2817 (setting forth the proposed rules N.J.A.C. 5:92-18.10 and -18.11). Negotiated agreements, subject to COAH's approval, could be allowed if they included incentives in exchange for higher fees. Ibid.

Similar to the ordinance at issue here, the rule provided for payments in lieu as follows:

(c) Municipalities may allow developers of sites zoned for inclusionary development to pay a fee in lieu of building low and moderate income units provided the Council determines the municipal housing element and fair share plan provides a realistic opportunity for addressing the municipal fair share obligation. The fee may equal the cost of subsidizing the low and moderate income units that are replaced by the development fee. For example, an inclusionary development may include a 20 percent set-aside, no set-aside and a fee that is the equivalent of a 20 percent set-aside or a combination of a fee and set-aside that is the equivalent of a 20 percent set-aside.

[*Ibid.* (setting forth the proposed rule *N.J.A.C.* 5:92-18.10(c)).]

These rules were adopted in December 1991, effective January 21, 1992, as *N.J.A.C.* 5:92-18.1 to -18.20, with minimal changes. 24 *N.J.R.* 235, 242-45 (Jan. 21, 1992).

As this historical recitation demonstrates, *Holmdel* and the regulatory scheme it spawned were meant to address development fees, *not* payments in lieu as described in Hoboken's affordable housing ordinance. *Holmdel*, *supra*, 121 *N.J.* at 578. Although the Middletown Township payment-in-lieu provision in *Holmdel* was substantially similar to the provision in Hoboken's ordinance, the *Holmdel* case involved a very dissimilar procedural posture from the present matter. The *Holmdel* case arose when municipalities were first tinkering with the idea of development fees. The *Holmdel* Court wanted COAH's regulatory input on this

issue before the State's numerous municipalities created a multitude of "cash cow" ordinances unrelated, and perhaps even inimical, to the public policy and constitutional underpinnings of the <u>Mount Laurel</u> Doctrine. The case before us here arose decades later, when COAH's position on how to deal with fees had been long established.

Independent of this historical analysis, we also find support for this outcome in the FHA. <u>N.J.S.A.</u> 52:27D-329.3(a) expressly authorizes "Payments in lieu" subject to regulatory oversight by COAH only when a municipality seeks substantive certification:

> The council may authorize a <u>municipality that has petitioned for substantive certification</u> to impose and collect payments-in-lieu of constructing affordable units on site upon the construction of residential development, which payments may be imposed and collected as provided pursuant to the rules of the council. Payment-in-lieu fees shall be deposited into a trust fund, and accounted for separately from any other fees collected by a municipality. Whenever a payment-in-lieu is charged by a municipality pursuant to this subsection, a development fee authorized pursuant to section 8 of P.L.2008, c.46 (C.52:27D-329.2) shall not be charged in connection with the same development.

> (Emphasis added).

This key distinction is also replicated in COAH's regulations. Under <u>N.J.A.C.</u> 5:97-8.3(b), a municipality is

authorized to impose "development fees" after it has "petitioned the Council" and obtained approval of its "development fee ordinance":

> No municipality, except municipalities seeking to achieve or that have received a judgment of compliance, shall impose or collect development fees unless the municipality has petitioned the Council with an adopted Housing Element and Fair Share Plan and the Council has approved the municipality's development fee ordinance pursuant to N.J.A.C. 5:96-5.1.
>
> [N.J.A.C. 5:97-8.3(b).]

By contrast, N.J.A.C. 5:97-8.4(a), the regulation permitting municipalities to include "payments in lieu" as an "option for onsite construction," does not contain the kind of COAH approval process reflected in N.J.A.C. 5:97-8.3(b). Indeed, N.J.A.C. 5:97-8.4(a) provides,

> [a] municipality may, as an option to the on-site construction of affordable housing otherwise required by ordinance, provide for a payment in lieu of construction subject to the requirements of this section and N.J.A.C. 5:97-6.4.[8]

To summarize, the payment in lieu section of the Hoboken Affordable Housing Ordinance did not require approval by COAH as a condition of enforcement.

---

[8] N.J.A.C. 5:97-6.4 describes the provisions of "Zoning for inclusionary development."

IV

## Conclusion

We reverse the trial court's decision invalidating the Hoboken Affordable Housing Ordinance for the reasons expressed here. We remand these cases to the trial court for such further proceedings as may be necessary to address and adjudicate to finality the remainder of the issues raised by defendants/third-party plaintiffs.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION